## UNITED STATES  DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**RANDY RICHTHOFEN #424780**                    **CIVIL ACTION**

**versus**                                       **NO. 05-5701**

**N. BURL CAIN, WARDEN,**                         **SECTION: "S" (1)**
**LOUISIANA STATE PENITENTIARY**

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1]  Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Randy Richthofen, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On March 17, 2000, he was convicted of second degree murder in violation of La.Rev.Stat.Ann. § 14:30.1.[2]  On March 27, 2000, he was sentenced to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[3]  On November 27, 2001, the Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence.[4]  He then filed with the Louisiana Supreme Court a related writ application which was denied on January 31, 2003.[5]

On February 2, 2004, petitioner filed with the state district court an application for post-conviction relief.[6]  That application was denied in part on April 27, 2004,[7] and the remaining claims were denied on June 14, 2004.[8]  On July 23, 2004, the Louisiana Fifth Circuit Court of

---

[2] State Rec., Vol. I of VIII, minute entry dated March 17, 2000; State Rec., Vol. I of VIII, jury verdict form.

[3] State Rec., Vol. VI of VIII, transcript of March 27, 2000, p. 21; State Rec., Vol. I of VIII, minute entry dated March 27, 2000.

[4] State v. Richthofen, 803 So.2d 171 (La. App. 5th Cir. 2001) (No. 01-KA-500); State Rec., Vol. I of VIII.

[5] State v. Richthofen, 836 So.2d 57 (La. 2003) (No. 2002-KO-0206); State Rec., Vol. I of VIII.

[6] State Rec., Vols. I and II of VIII.

[7] State Rec., Vol. II of VIII, Order dated April 27, 2004.

[8] State Rec., Vol. II of VIII, Order dated June 14, 2004.

Appeal found "no error" with respect to those rulings,[9] and the Louisiana Supreme Court denied a related writ application on June 17, 2005.[10]

On August 10, 2005, petitioner filed this federal application for *habeas corpus* relief.[11]  In support of his application, he raises the following claims:

1.      The grand jury was empaneled in a discriminatory manner;

2.      The trial court erred in allowing the prosecution to proceed where essential elements were missing from the indictment;

3.      The trial court improperly denied a defense challenge for cause during voir dire;

4.      The trial court erred in allowing the introduction into evidence of multiple photographs of the victim, hearsay statements, and inflammatory evidence;

5.      The prosecutor knowingly used false testimony;

6.      The prosecutor made an improper closing argument;

7.      The trial court erred in giving an erroneous jury instruction regarding the burden of proof and in not giving a limiting jury instruction on "other crimes" evidence;

---

[9]  <u>Richthofen v. Cain</u>, No. 04-KH-866 (La. App. 5th Cir. July 23, 2004) (unpublished); State Rec., Vol. II of VIII.

[10]  <u>State *ex rel.* Richthofen v. State</u>, 904 So.2d 687 (La. 2005) (No. 2004-KH-2409); State Rec., Vol. II of VIII.

[11]  Rec. Doc. 4.

8.      There was insufficient evidence to support petitioner's conviction;

9.      The trial court failed to recognize a mandatory sentencing issue; and

10.     Petitioner received ineffective assistance of counsel.[12]

The state contends that petitioner's federal application is untimely.[13]   For the following reasons, this Court disagrees.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his conviction or sentence becomes "final."  Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review.  28 U.S.C. § 2244(d)(1)(A).[14]

As noted, on January 31, 2003, the Louisiana Supreme Court denied petitioner's writ application challenging the state intermediate appellate court's judgment affirming his conviction. For AEDPA purposes, his conviction became "final" ninety (90) days later when his period expired for seeking a writ of certiorari from the United States Supreme Court.  See Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999); Chester v. Cain, Civ.

---

[12]   Petitioner listed twenty-one claims in his federal application.  Those overlapping claims have been consolidated and reorganized in a more logical manner for ease of analysis; however, all of the claims are addressed in this opinion.

[13]   Rec. Doc. 9, pp. 21-24.

[14]   Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are inapplicable in the instant case.

Action No. 01-1958, 2001 WL 1231660, at *3-4 (E.D. La. Oct. 15, 2001); see also U.S. Sup. Ct. R. 13(1).[15]   Accordingly, petitioner's one-year period for seeking federal *habeas corpus* relief commenced on May 1, 2003, and expired one year later unless that deadline was extended through tolling.

The Court first considers statutory tolling.  The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court.  28 U.S.C. § 2244(d)(2).

Two hundred seventy-six (276) days of petitioner's one-year statute of limitations elapsed prior to being tolled by the filing of his post-conviction application on February 2, 2004.  Although that application was denied, tolling then continued uninterrupted during the period of appellate review, so long as petitioner sought such review in a timely manner.  See Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004).  Assuming petitioner

---

[15]   The state contends that petitioner's conviction began final much earlier because his Louisiana Supreme Court writ application was untimely filed.  However, as the petitioner notes in his traverse, that contention has no merit.  The Louisiana Fifth Circuit Court of Appeal affirmed petitioner's conviction and sentence on November 27, 2001; therefore, he had until December 27, 2001, to file his writ application with the Louisiana Supreme Court.  See Louisiana Supreme Court Rule X, § 5(a).  Petitioner has furnished proof that he gave that writ application to jail officials for mailing on December 19, 2001, well before the deadline.  Rec. Doc. 10, Exhibit L.  Accordingly, pursuant to the state "mailbox rule," which this Court must apply, the writ application was timely filed as of December 19, 2001.  See Causey v. Cain, 450 F.3d 601, 604-05 (5th Cir. 2006).

sought such appellate review in a timely manner,[16] the statute of limitations again remained tolled until the Louisiana Supreme Court denied writs on June 17, 2005.

At that point, petitioner had eighty-nine (89) days remaining of his statute of limitations. Because his federal application was filed fifty-four (54) days later on August 10, 2005, it was timely filed.[17]

Exhaustion

In its response, the state notes that it has been unable to determine whether petitioner exhausted his state court remedies with respect to all of his claims. Nevertheless, even if there were an exhaustion problem, federal law "allows a federal court, in its discretion, to *deny habeas relief on the merits, regardless of whether the applicant has exhausted state remedies*" and whether

---

[16]   The state contends that petitioner's related writ applications were not timely filed, a contention petitioner disputes. Based on evidence provided by petitioner, the Court will assume that the filings were in fact timely for the following reasons.

As to the intermediate appellate court filing, that court dismissed the writ application on the merits, not as untimely. Richthofen v. Cain, No. 04-KH-866 (La. App. 5th Cir. July 23, 2004) (unpublished); State Rec., Vol. II of VIII. Moreover, the application would have been due on or before July 14, 2004. See Louisiana Uniform Rules of the Courts of Appeal Rule 4-3. Under the mailbox rule, the application was considered filed as of the date it was given to prison officials for mailing. Causey, 450 F.3d at 604-05. Petitioner has provided evidence indicating that it was given to prison officials on July 14, 2004. Rec. Doc. 10, Exhibit F.

As to the Louisiana Supreme Court filing, that filing was due on or before Monday, August 23, 2004. See Louisiana Supreme Court Rule X, § 5(a); see also La.C.Cr.P. art. 13(2); La.Rev.Stat.Ann. § 1:55(A). Petitioner has provided evidence indicating that it was given to prison officials for mailing on that date. Rec. Doc. 10, Exhibit H.

[17]   Petitioner signed his application on August 10, 2005. Rec. Doc. 4. That date represents the earliest date that petitioner could have presented his application to prison officials for mailing and, therefore, the earliest date that this Court could deem his *habeas* petition to have been filed for statute of limitations purposes. Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).

exhaustion is waived by the state.  Jones v. Jones, 163 F.3d 285, 299 (5th Cir. 1998) (emphasis in

original); 28 U.S.C. § 2254(b)(2).  In the interest of judicial economy, the undersigned recommends

that petitioner's claims simply be denied on the merits.

Standard of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation,

including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of

review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that

the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law

and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).  Hill

v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer

to the state court's decision unless it "was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(d)(1).  The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses
> have independent meaning.  A federal habeas court may issue the writ
> under the "contrary to" clause if the state court applies a rule different
> from the governing law set forth in our cases, or if it decides a case
> differently than we have done on a set of materially indistinguishable
> facts.   The court may grant relief under the "unreasonable
> application" clause if the state court correctly identifies the governing
> legal principle from our decisions but unreasonably applies it to the
> facts of the particular case.   The focus of the latter inquiry is on
> whether the state court's application of clearly established federal law
> is objectively unreasonable, and we stressed in Williams[ v. Taylor,
> 529 U.S. 362 (2000)] that an unreasonable application is different
> from an incorrect one.

– 7 –

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

<u>Facts</u>

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this case as follows:

> At trial, the following testimony and evidence was presented. On August 18, 1998, Brenda Boudreaux (Brenda) died as a result of injuries to her head. Becky Boudreaux (Boudreaux), Brenda's mother, testified for the State that she was 13 or 14 years old when she first met the Defendant, who was a friend of her mother. In October of 1997, Boudreaux and the Defendant started dating. They moved-in together at the end of January of 1998 and resided at 719 Avenue B in Westwego. Becky was seventeen years old at the time. Brenda, born on April 28, 1997, also lived with them. [FN1] The Defendant's daughter, Brittany Richthofen, (Brittany) who was six-years-old at the time, started living with them about the second week of February, 1998 and was living with them at the time Brenda became ill.

> [FN1] Brenda was born with physical disabilities, diagnosed as Adams Oliver Syndrome. Brenda's left eye was not fully developed and, therefore, she had an artificial eye from which she could not see. Brenda's arms were not fully developed either; the left arm stopped at the elbow, and there were only three fingers on her right hand. Boudreaux stated that Brenda's brain and "everything else" was normal.

> Boudreaux testified that on April 2, 1998, her father, Louis Boudreaux, was in West Jefferson Hospital (West Jefferson).

Boudreaux left home about 6:30 p.m. to go visit her father.  She left Brenda in the Defendant's care while she was at the hospital.  Brittany was also at home with the Defendant on that day.  Boudreaux stated that she left the hospital at about 8:30 p.m. to go back home.  When she got back home, Brenda was asleep.

The next morning, Boudreaux got up and got Brittany dressed to go to school.  When Boudreaux tried to wake up Brenda, she kept closing her eyes and would not wake up.  Brenda was listless, weak and not alert.  Boudreaux testified that usually Brenda woke up laughing and would "get into stuff," move around and would want to eat breakfast.  Boudreaux dropped Brittany off at school and brought Brenda to the emergency room at West Jefferson.  Boudreaux assumed Brenda was dehydrated because the week before, she had been vomiting and also had diarrhea.  Boudreaux stayed at the hospital with Brenda until 10:00 in the evening and then went home.  About 4:30 or 5:00 in the morning, Boudreaux got a call from Dr. Gerald Ross in the pediatric intensive care unit who told her that Brenda had stopped responding and that he wasn't sure why.  The Defendant dropped Boudreaux off at the hospital.  She went and talked to Dr. Ross and then waited.  Brenda went into a coma, and the doctors performed brain surgery.  After the surgery, they put Brenda on a life support machine.  She stayed in the hospital for a few days.  They didn't expect her to live.  Brenda started to breathe on her own about a week later.  They took her off the ventilator and the following week, they sent her to Children's Hospital for rehabilitation.  Brenda could not eat, so the doctors surgically inserted a feeding tube.  She stayed at West Jefferson for about two weeks, and she stayed at Children's Hospital for about a month.  Brenda eventually went home and physical therapists came to the house and worked with her.  Boudreaux took Brenda to the doctors for follow-up appointments and she kept bringing her to the hospital because she was running a high fever.  When the fever would go down, she would bring Brenda home.  The doctors had to insert a shunt in Brenda's head to keep the fluid from building up on her brain.  After Brenda came home, she couldn't do anything.  She would lay down and cry or would do nothing and stare.  She didn't move, laugh or smile and she would not respond if her name was called or to noise.  Boudreaux identified photographs of Brenda taken before and after April 2, 1998, marked for identification as state's exhibits one through 11 and 21 through 27, respectively.  Boudreaux testified that Brenda never returned to the way she was prior to the April 2nd incident.

Boudreaux stated that she saw the Defendant become angry with Brenda often, between five and ten times. She testified that Brenda's crying caused the Defendant to become angry. In response, the Defendant would take Brenda and put her in bed and put blankets around her where she couldn't see anything, and a few times he put blankets over her, and Boudreaux would go and remove them. When Brenda cried during the night, the Defendant would take her and put her in the playpen in a room in front of the house. Boudreaux stated that in the middle of March, every time the Defendant would enter into the room, or go near Brenda, she would stop doing whatever she was doing, stare for a second and cry.

On one occasion, after Boudreaux had bathed Brittany, Boudreaux came out of the room and saw Brenda in the Defendant's arms. Brenda was not alert, so the Defendant put her in cold water and then Brenda started crying. Boudreaux stated that "it looked like he knew what he was doing." On that occasion, Brenda was in the same condition which she was in when Boudreaux brought her to the hospital in April of 1998. Boudreaux testified that Brenda was in that same condition on two other occasions. Boudreaux also testified that the Defendant had been physically violent with her on several occasions.

When the doctors told Boudreaux that Brenda had suffered Shaken Baby Syndrome, Boudreaux thought that the Defendant had done it. Boudreaux testified that nothing else had happened to Brenda while she was in her care that could have explained that kind of injury. Other than Boudreaux, no one else had primary responsibility for caring for Brenda. Brenda did not have any accidents or falls that would have caused that kind of injury. Boudreaux stated that she did not see any bruises or bumps or anything on Brenda which would have indicated that she had bumped her head or fallen. Boudreaux admitted that, during the course of the investigation into Brenda's injury, she was at times untruthful with the police because she was scared and didn't know what to say. Boudreaux testified that she was scared to talk to the detectives the first few times because the Defendant had told her to tell the police that she lived with her aunt and not him.

Dr. Ross, who was qualified as an expert witness in the field of pediatric intensive care, testified for the State that in April of 1998, Brenda was admitted to West Jefferson as someone who was dehydrated due to vomiting and diarrhea. When Brenda failed to respond to 24 hours of rehydration, Dr. Ross was consulted. Dr. Ross

stated that when he first saw Brenda, she appeared somewhat dehydrated and listless, and had a decreased level of consciousness. She was not interactive and only responded to deep pain and other forceful stimuli. Dr. Ross performed a physical examination of Brenda, but he did not note any external signs of trauma.

Dr. Ross stated that her condition acutely, or suddenly, deteriorated. When he examined Brenda, he found a pupil that was dilated. Upon examination of her fundus, the back part of the eye, he found hemorrhages. Dr. Ross found her to be hypertensive and bretacartic, which meant a slow heart rate. Those findings indicated to him that there was a pathology inside the head. He found her to be hydrated adequately. Dr. Ross ordered a computerized axial tomography (CAT) scan which showed acute hemorrhage and subacute fluid that may have been old blood or a different collection of fluid. In his opinion, the acute hemorrhage occurred within 24 to 72 hours prior to her acute deterioration, and that the acute deterioration occurred a day or two after her admission. Dr. Ross testified that the subacute fluid occurred less than a week or two prior to her acute deterioration. Dr. Ross testified that he was not sure what caused the subacute fluid in this case, but that subacute blood was caused by Shaken Baby Syndrome. Dr. Ross indicated that retinal hemorrhaging could be caused by hypertension or eye problems, but that 99 percent of the time it was caused by Shaken Baby Syndrome.

Dr. Ross determined that Brenda had an intracranial bleed, a hemorrhage, and consulted Dr. John Steck, a neurosurgeon. They decided that Brenda needed to undergo surgery immediately. During surgery, Brenda had a cardiopulmonary arrest, which was similar to a heart attack. They stabilized her condition, and she remained in ICU. Dr. Ross testified that he ruled out the diagnosis of dehydration and started to investigate whether Brenda had Shaken Baby Syndrome, which was one of the causes of acute intra ventricular intracranial bleeds. Dr. Ross explained that Shaken Baby Syndrome or blunt trauma could have caused the blood vessels to shear in the eyes and in the brain. He stated that Shaken Baby Syndrome occurred when a baby has been held and shaken in a back and forth type movement. Dr. Ross found no evidence of blunt trauma to Brenda. He testified that it would take "quite violent force" to shear blood vessels inside a child's brain or in her eyes. Dr. Ross stated that there was no doubt in his mind that Brenda suffered this type of injury causing event. He stated that Brenda was an at-risk child in that she

had some congenital abnormalities which put her at risk for abuse. After Brenda's surgery, Dr. Ross consulted with Dr. Scott Benton who agreed that this was a Shaken Baby Syndrome case, after Dr. Scott had performed a physical examination of Brenda. He testified that he was aware that Brenda had been diagnosed with Adams Oliver Syndrome, but that would not have caused massive hemorrhaging like she had. He stated that although he was not 100 percent sure this was a Shaken Baby Syndrome case, he was 99.9 percent sure.

Dr. Steck, who was qualified as an expert in the field of neurosurgery, testified at trial for the State and corroborated Dr. Ross. When he saw during surgery that Brenda had an extremely elevated intracranial pressure, he was convinced that Brenda had Shaken Baby Syndrome because there was no external evidence of serious head trauma. The degree of pressure indicated to Dr. Steck that Brenda had suffered a severe brain injury. Dr. Steck testified that Brenda's Adams-Oliver Syndrome had nothing to do with the injury which she sustained. He also stated that there would be clear evidence of external trauma if her injury had been caused by an accidental fall and that there was "no way" that her condition was caused by a car accident. Dr. Steck explained that Shaken Baby Syndrome is caused by a repetitive flopping back of the head, and that because of a baby's weak neck muscles, the shaking causes a bruising of the brain.

Dr. Steck testified that he saw Brenda again in August of 1998 when he was consulted in the hospital for consideration that she may have hydrocephalus, which he explained was an accumulation of fluid within the brain. He stated that the hydrocephalus was a progression of the brain injury which Brenda suffered as a result of the Shaken Baby Syndrome diagnosed in April of 1998. Dr. Steck explained that the brain was actually dying, that the neurons were permanently injured and had died and that brain cells were being lost which caused the ventricles to increase in size. He performed a ventricular perineal shunt to allow the fluid to get out of the brain and to be absorbed by the body in another manner. After that, Dr. Steck saw Brenda again because her pediatrician noticed that she had a bulging fontanelle. A CAT scan indicated that the shunt which Dr. Steck had placed was not functioning properly and would need to be revised. However, when Brenda came in, she had a fever and an elevated white count, and they worried that she might have an underlying infection, so they treated her with antibiotics. Brenda came back again. Dr. Steck operated on Brenda again and took the shunt out and put in a temporary drain until they could determine that she had no infection.

He stated that the operation went well.  However, Brenda had a problem that night and died.  Dr. Steck testified that the ultimate cause of Brenda's death was Shaken Baby Syndrome which occurred within a couple of days before he initially saw her in early April of 1998.

Dr. Benton, who was qualified as an expert in the field of forensic pediatrics, testified for the State that he first saw Brenda on April 6, 1998 after receiving a referral from Lieutenant Joe Ellington of the Westwego police department.  Dr. Benton got permission from Dr. Ross to see Brenda, and Dr. Ross indicated to him that she was a critical patient, meaning that she could die at any moment.  Dr. Benton performed a physical examination of Brenda and consulted with a geneticist about Adams-Oliver Syndrome which is an extremely rare condition.  Dr. Benton explained that as a result of this syndrome, Brenda had a scalp defect, abnormalities and missing parts of the limbs, amniotic bands and heart defects.  He stated that persons with Adams Oliver Syndrome have normal intelligence and normal brain function.  Dr. Benton reviewed the diagnostic tests done and the literature regarding Adams-Oliver Syndrome and diagnosed Brenda with Shaken Infant Impact Syndrome, also called Shaken Baby Syndrome, or possibly a variant called Tin Ear Syndrome.

Dr. Benton explained Shaken Infant Impact Syndrome to the jury using graphics and diagrams, State's exhibits 28 through 54. He stated that nothing else could have caused Brenda's condition.  Dr. Benton testified that she had bruising around one ear which indicated blunt trauma to the ear.  He said that he hadn't seen that finding noted by any of the other doctors.  Dr. Benton stated that the injury to the ear, the subdural hematomas, retinal hemorrhages, and the brain injury all fit Tin Ear Syndrome.  He stated that he sees this syndrome in children who have been hit across the head, which impacts the ear and spins the head around with enough force that the child gets all the same findings as Shaken Infant Syndrome.  Dr. Benton said that in making the diagnosis of Shaken Baby Syndrome, the history needed to be devoid of any significant accidental trauma, and that in Brenda's case, he was not presented with any history to account for the severity of the injuries which he saw.  Dr. Benton stated with absolute certainty that the trauma which Brenda suffered pre-existed her admission to the hospital.  He testified that he didn't know whether the injury to her ear went together with the rest of her brain findings or if it was an isolated incident where someone accidentally bumped her ear during the course of her hospitalization.

Dr. Benton's opinion that Brenda suffered angular acceleration injury was based on the fact that she had cerebral edema, a comatose state, blood in a space in her head where it didn't belong, and a bruise to the ear. Even if the bruise to the ear occurred after admission, all of the remaining findings still indicated to Dr. Benton that she suffered Shaken Baby Syndrome. Dr. Benton stated that subdural hematomas like Brenda's can only occur as a result of high velocity injuries, such as side impact car accidents, falls from multi-story buildings, or other situations involving significant trauma. He testified that subdural hematomas don't occur by accidentally hitting the head on the gurney cart or by a nurse accidentally hitting the ear.

Dr. Susan Garcia, who was qualified as an expert in the area of forensic pathology, testified for the State that she performed an autopsy on Brenda on August 19, 1998. Dr. Garcia stated that Brenda's brain weighed less than it should have for an infant of her size and that she had sustained some type of injury to her brain matter which caused it to shrink. There was fluid where tissue should have been. Dr. Garcia found certain inflammatory changes in her spinal cord and in the dura, the covering of the brain, that indicated she had some bleeding event prior to that time. Dr. Garcia stated that it was old bleeding and that she couldn't tell when it happened.

Dr. Garcia obtained Brenda's medical records from Children's Hospital. Based on a review of the records and the autopsy, Dr. Garcia opined that Brenda had sustained a traumatic brain injury immediately prior to her presentation at Children's Hospital three months prior to death. Dr. Garcia testified that, because of the lack of certain changes and the time span, she was unable to say with 100 percent accuracy that it was Shaken Baby Syndrome, but that would be her primary diagnosis on a differential list of possible mechanisms. Dr. Garcia stated that Brenda's traumatic brain injury was not a natural disease process and therefore it was a homicide because she could not have inflicted it herself. She testified that she would not have expected to see this type of injury in a child that fell and bumped her head, or in a child that rolled around on the floor and bumped her head on a coffee table, or in a child who was picked up and placed back down quickly.

Brittany was called as a witness by the State. [FN2] Brittany, age eight, testified that she lived with the Defendant, Boudreaux and Brenda before she started living with her grandparents. Brittany stated that the Defendant once had to babysit her and Brenda while Boudreaux was visiting her father at the hospital. Brittany and

Brenda stayed in the room and played Sega while Boudreaux was gone.  The Defendant was watching television in his room, but came into the other room twice to change Brenda's diaper.   Brittany testified that the Defendant never picked up Brenda while Boudreaux was at the hospital, and that she never told anyone that she saw the Defendant pick up Brenda while Boudreaux was at the hospital.  The State then impeached Brittany by showing a videotape to the jury. [FN3]

> [FN2]  At first, Brittany refused to come into court and testify, so a hearing was held where she ultimately decided she would testify and the trial judge decided that she was competent to testify.

> [FN3]  The videotape, State's exhibit 57, shows a woman questioning Brittany about Brenda.  Brittany tells the woman that Brenda was very sick and vomited a lot, "a million times."  She stated that on one occasion, she was peeking through the door to the kitchen and saw her father shake Brenda, which Brittany demonstrated with a doll.  Brittany said that her father then took Brenda's clothes off and put her in cold water, and then put Brenda's clothes back on. Brittany said that Boudreaux was in the kitchen with her father and told him to stop shaking the baby. Brittany stated that she went to her bedroom.  Her father came into the bedroom and asked what she was doing, and Brittany said she was looking for something with which to play.  Brittany said that her father locked her in her bedroom.  She stated that she only saw her father shake Brenda that one time.

Brittany said that before the interview on the videotape, her mother said, "say that your daddy shook the baby or I'm going to woop your butt."  Brittany testified that she remembered telling the woman that her father had shaken the baby, but that he didn't shake the baby.  She stated that she had told the prosecutor previously that she saw her father shake the baby.  However, she testified that she only said that because her mother was in the room and told her that if she didn't say that, she was going to give her dog food for dinner. Brittany stated that she lived with her grandparents and that since she

had been living there, her father had called and talked to her "way more than ten times." She testified that she had spoken to her father two nights prior. Brittany stated that when her father took her to her mother's house after Brenda had to go to the hospital in April, she heard her father tell her mother, "whatever happens just take care of my daughter." Brittany testified that no one ever babysat her and Brenda other than the Defendant.

Jessica Avila (Avila), Brittany's mother, was called as a witness by the State. She testified that prior to the April incident, Brittany stayed with her father (the Defendant) during the week and on weekends she would stay with Avila. Avila testified that the Defendant dropped off Brittany unexpectedly one afternoon at the end of March or the beginning of April 1998, and that he told her, "whatever happens, take care of my daughter." The Defendant explained to Avila that Brenda was sick and had to go to the hospital. The State impeached Brittany through Avila's testimony. Without objection by the Defendant, Avila testified that when she spoke to Brittany that night about what happened to Brenda, Brittany told her that the night before Brenda had to go to the hospital, Brenda had started crying, and her father shook her, put her on the bed and she went to sleep. Avila stated that Brittany demonstrated to her how her father had shaken Brenda that night.

The Defendant called Avila the day after he dropped off Brittany and identified himself by his nickname, "Lip." The Defendant asked Avila to call Johnny Johnson (Johnson). The Defendant told her he had put his jewelry in the trunk of his car and he wanted to let Johnson know where the keys were "in case anything happened." He said that his car was in the hospital parking garage. The Defendant told Avila that he was about to be taken in for questioning about Brenda. Avila placed the three-way call to Johnson. She listened for a moment and then hung up. Avila testified that she took her daughter to be interviewed at several different places. However, she said that she never told Brenda what to say, nor did she threaten her in any way. Brittany told Avila after that night that her father had been "mean" to Brenda. Avila testified that Brittany did not want to come to court and testify because she was "scared that she was going to send her daddy to jail." Avila also said that she never fed her daughter dog food. Avila testified that the relationship between her and the Defendant did not work-out because it was violent. She said that while she was in a relationship with the Defendant, she was sometimes afraid of him.

- 16 -

Pattie Gros Harris (Harris), who was called as a witness by the State, was qualified as an expert in the field of physical therapy. She testified that she had worked with Brenda from age six or eight weeks to 10 or 11 months. She testified that Boudreaux took very good care of Brenda. Harris said that at the end of March or in April of 1998, Brenda's performance deteriorated a great deal and she was very lethargic, unable to participate and cried the whole time. Boudreaux told Harris that Brenda had been having a stomach virus and was dehydrated. Harris never saw Brenda again after the end of March until her funeral. Harris testified that during the time she saw Brenda, she was going through developmental milestones, achieving goals Harris set, progressing well and was Harris' "star patient."

Donna Stall was qualified as an expert in the field of early childhood development and testified for the State. She testified that she would have expected Brenda to have developed and lived a normal life despite her congenital problems because all of her problems were physical. Stall stated that she continued to see Brenda once or twice a week until her death. It was Stall's impression that Boudreaux was a "remarkable" caregiver for Brenda and that she was actively involved in trying to help her develop. Stall stated that in late February or early March, Brenda had a virus, so she didn't see her for a few weeks. When Stall went to see her again, Brenda did not respond to Stall like she normally did. Brenda cried the whole time and there was nothing Stall could do to console her. Stall testified that at that time, Brenda was "scared to death" of her. She stated that she had never seen Brenda cry before. Stall explained that it was a "strange" kind of behavior, and that it was not a cry like she was afraid, but it was a "moaning, whining, just a sick cry." When she saw Brenda after she got out of the hospital, she could not do what she did before. She could not track movement, she was drooling "like a stroke victim," she didn't smile or laugh, she couldn't hold her head up, and she made no sound other than a low moaning. Stall testified that, if Brenda had lived, she had no chance of having a normal life after her hospitalization.

Johnson, who was called as a witness by the State, testified that he was a good friend of the Defendant and had known him for two years. Johnson stated that he received an unusual telephone call from the Defendant at the end of March or the beginning of April of 1998. Johnson thought that the Defendant was calling from West Jefferson. The Defendant told Johnson to go get his car out of the parking lot at West Jefferson and bring it to his mother, which he did.

Johnson testified that the Defendant told him that his jewelry was in the trunk of the car. Johnson stated that he looked in the trunk of the car and found the jewelry and that there was nothing in the trunk other than the jewelry, tools and a jack.

Cynthia Casbon, who was called by the defense, testified that she was friends with the Defendant and had known him for nine years. She stated that she had been romantically involved with him at one time, was currently married and living in Georgia, but had maintained constant contact with the Defendant. Casbon testified that she helped the Defendant take care of Brittany right after she was born. Casbon stated that in June or July of 1998, she came to New Orleans for a visit. During that visit, Brittany told Casbon that her mother had said that if she did not tell the detectives that her father had shaken the baby, that her mother would whip her. Casbon testified that she had a second conversation with Brittany and that Brittany had told her that her father did not shake the baby. Casbon stated that she last talked to the Defendant in August of 1998, that she had tried to locate him when she was in town in June or July of 1998, but couldn't.

Casbon testified that she called Johnson's house in May or June of 1998 and that Johnson told her the whereabouts of the Defendant. In June or July of 1998, when she came into town for a visit, Casbon spoke to the Defendant's parents. Casbon testified that Brittany was with the Defendant's parents when Casbon spoke to them. After Brittany told Casbon that her mother wanted her to lie, Casbon told the Defendant's parents. Casbon said that Brittany never gave her a reason why her mother wanted her to lie. Casbon testified that Avila caused problems while she (Casbon) was dating the Defendant, and that Avila told the Defendant that if he continued to see Casbon, he would not be able to see his daughter, so Casbon "backed out of the picture." Casbon stated that she did not like Avila, but that she had no ill feelings towards her. She said that she had never spoken with the police about the information Brittany gave her. She stated that she "believed" she told the Defendant that Brittany told her that her mother had asked her to lie about his involvement in the case.

The Defendant did not testify.  There was evidence admitted that he had been involved in physical violence to another juvenile who had lived with him at an earlier time.[18]

Grand Jury Claims

Petitioner argues that the grand jury was empaneled in a discriminatory manner and pursuant to a method set forth in an unconstitutional state law.  Based on the state court decisions rejecting these claims, this Court finds that the claims are procedurally barred.[19]

Regarding procedural bars, the United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.  To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims.  This rule applies to state court judgments on both substantive and procedural

---

[18]  State v. Richthofen, 803 So.2d 171, 175-83 (La. App. 5th Cir. 2001) (No. 01-KA-500); State Rec., Vol. I of VIII.

[19]  The state has filed only a partial response in this matter, indicating that a supplemental response would be filed if the Court were to reject the arguments that petitioner's federal application should be dismissed as untimely and for the failure to exhaust his state court remedies.  The Court declines to allow that piecemeal procedure in this case, in that, for the reasons set forth in this opinion, it is apparent that no supplemental response is necessary because petitioner clearly is not entitled to relief.  However, because the state failed to respond to the instant grand jury claims at all, it has not raised the issue of the procedural default with respect to those claims.  Nevertheless, a federal *habeas* court has the discretion to raise a procedural default *sua sponte*.  See Magouirk v. Phillips, 144 F.3d 348, 357-58 (5th Cir. 1998).  Accordingly, **petitioner is hereby specifically instructed that this Report and Recommendation is notice to him that this Court is *sua sponte* raising the procedural bar and that petitioner must submit any evidence or argument concerning that issue as part of any objections he may file to this report.**  Id. at 348.

> grounds.  Where there has been one reasoned state judgment rejecting
> a federal claim, later unexplained orders upholding that judgment or
> rejecting the same claim are presumed to rest upon the same ground.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).  "A state court expressly and

unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches

the merits of a [petitioner's] claim."  Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999); see also

Soria v. Johnson, 207 F.3d 232, 249 n.24 (5th Cir. 2000).

In the last reasoned state court judgment addressing the grand jury claims, the

Louisiana Fifth Circuit Court of Appeal clearly rejected those claims based on Louisiana's rule that

challenges to an indictment are waived if not raised in a pretrial motion to quash.  That court held:

> By these assignments of error the Defendant argues that his
> second degree murder conviction should be reversed on the ground
> of discriminatory selection of the grand jury.  He alleges a violation
> of the equal protection and due process clauses based upon the
> systematic exclusion of blacks from the position of grand jury
> forepersons.  The Defendant also contends that the former system for
> selecting grand jury forepersons pursuant to La.C.Cr.P. art. 413(B)
> encouraged race-based decision-making by judges and was, therefore,
> unconstitutional.
>
> Any objections arising from the selection of the grand jury
> foreperson are treated as ones alleging discriminatory selection of
> grand jurors.  Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419,
> 140 L.Ed.2d 551 (1998).  All equal protection claims arising out of
> the selection or composition of grand juries in Louisiana remain
> subject to this State's procedural requirements.  Any equal protection
> claim that is not asserted in a pre-trial motion to quash is waived.
> La.C.Cr.P. arts. 533(1) and 535(D); State v. Pierre, 99-3156 (La.App.
> 4th Cir. 7/25/01), 792 So.2d 899, 907; State v. Robinson, 32 794
> (La.App. 2nd Cir. 3/1/00), 754 So.2d 311, 321-322, writ denied,
> 00-989 (La. 3/23/01), 787 So.2d 1008; State ex rel. Roper v. Cain,
> 99-2173 (La.App. 1st Cir. 10/26/99), 763 So.2d 1, 4-5, writ
> dismissed, 00-975 (La. 11/17/00), 773 So.2d 733; Deloch v. Whitley,
> 96-1901 (La. 11/22/96), 684 So.2d 349.  The record in the instant

case is void of a pre-trial motion to quash the indictment filed on behalf of the Defendant.  Since the Defendant did not preserve this objection by filing such a motion, the objection is waived and may not be considered on appeal.

In State v. Langley, 95-1489 (La. 6/19/98), 711 So.2d 651, 675 (on rehearing), the Louisiana Supreme Court (citing Campbell v. Louisiana) remanded a case for an evidentiary hearing on the defendant's allegation that the foreperson of the grand jury was selected in an intentionally discriminatory manner.  In doing so, the court indicated the issue had been "properly raised before trial."  In the instant case, unlike the defendants in Campbell and Langley, the Defendant did not preserve the issue for review.

Moreover, even if we considered the issue under Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 1424, 140 L.Ed.2d 551 (1998), Defendant's argument fails because he did not carry his burden of proof of establishing a prima facie case of purposeful discrimination.  This assignment of error lacks merit.[20]

The Louisiana Supreme Court denied petitioner's related writ application without assigning reasons.[21]

It is therefore clear that the state court rejected petitioner's grand jury claims based on a procedural rule, i.e. that claims were waived because they were not presented in a pretrial motion to quash.  It is further clear that the state rule invoked is an independent and adequate state ground so as to support the application of a procedural bar.  See, e.g., Williams v. Cain, 125 F.3d 269, 274-76 (5th Cir. 1997).

"When the state court has relied on an independent and adequate state procedural rule, federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that

---

[20]  State v. Richthofen, 803 So.2d at 194; State Rec., Vol. I of VIII.

[21]  State v. Richthofen, 836 So.2d 57 (La. 2003) (No. 2002-KO-0206); State Rec., Vol. I of VIII.

a failure to address the claim will result in a fundamental miscarriage of justice." Hughes v.

Johnson, 191 F.3d 607, 614 (5th Cir. 1999). In the instant case, petitioner can demonstrate neither.

Petitioner cannot meet the "cause and prejudice" test in light of the United States

Fifth Circuit Court of Appeals' decision in Pickney v. Cain, 337 F.3d 542 (5th Cir. 2003). In that

case, petitioner's claim regarding discrimination in the selection of the grand jury foreperson was

procedurally defaulted in state court because no motion to quash had been filed. The Fifth Circuit

found that petitioner could not overcome the resulting federal procedural bar based on the "cause and

prejudice" requirement, holding:

> We need not address whether [petitioner] has made a showing
> of "cause" because we are confident that he has not been prejudiced.
> United States v. Shaid, 937 F.2d 228, 234 (5th Cir. 1991). After
> reviewing the trial record, we have no doubt that, if [petitioner] had
> been successful in having his indictment quashed, the State of
> Louisiana would have sought and obtained a second indictment. ...
> Given the strength of the State's case, a successful grand jury
> challenge would have served no purpose other than to delay the trial.
> Accordingly, [petitioner] has failed to prove actual prejudice.

Id. at 545. Similarly, this Court has reviewed the evidence against this petitioner and reached the

same conclusion. Accordingly, petitioner cannot overcome the procedural bar in this case based on

the "cause and prejudice" test.

Therefore, petitioner's claims are procedurally barred unless the application of the

bar will result in a fundamental miscarriage of justice. In order to establish a "fundamental

miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent

of the charges against him. Essentially, the petitioner must show that, as a factual matter, he did not

commit the crime for which he was convicted." <u>Finley v. Johnson</u>, 243 F.3d 215, 220 (5th Cir. 2001)

(citations omitted). The United States Fifth Circuit Court of Appeals has held:

> To demonstrate actual innocence, it is necessary that the petitioner show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt ... in light of all of the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongfully excluded or to have become available only after trial.

<u>Lucas v. Johnson</u>, 132 F.3d 1069, 1077 (5th Cir. 1998) (quotation marks and citations omitted).

Applying that standard, and considering the evidence of petitioner's guilt in this case, the Court finds

that petitioner cannot make a persuasive showing that he is actually innocent of the charges against

him. Therefore, he cannot demonstrate that any miscarriage of justice will result from application

of the procedural bar. Accordingly, petitioner's grand jury claims are procedurally barred in this

federal proceeding.

<u>Indictment</u>

Petitioner claims that the trial court erred in allowing the prosecution to proceed

where essential elements were missing from the indictment. However, the sufficiency of a state

indictment is not a matter for federal *habeas* relief unless it can be shown that the instrument is so

defective that it deprives the state court of jurisdiction. <u>McKay v. Collins</u>, 12 F.3d 66, 68 (5th Cir.),

<u>reh'g granted in part on other grounds sub nom.</u>, <u>Williams v. Collins</u>, 12 F.3d 70 (5th Cir. 1994) (per

curiam). The United States Fifth Circuit Court of Appeals has observed that the sufficiency of a

state charging instrument is fatally defective only when there are no circumstances under which there

could be a valid conviction based on that instrument, and that "determination can be made *only* by

looking to the law of the state." Liner v. Phelps, 731 F.2d 1201, 1203 (5th Cir. 1984) (internal

quotation marks omitted) (emphasis in original).

For many years, Louisiana courts insisted that charging documents be technically

sufficient.  However, in State v. James, 305 So.2d 514 (La. 1974), the Louisiana Supreme Court

changed course, holding:

> [W]here in fact an accused has been fairly informed of the charge
> against him by the indictment and has not been prejudiced by surprise
> or lack of notice, the technical sufficiency of an indictment may not
> be questioned after conviction where, as here, no objection was raised
> to it prior to the verdict and where, without unfairness, the accused
> may be protected against further prosecution for any offense or
> offenses charged by it through examination of the pleadings and the
> evidence in the instant proceeding.

Id. at 516-17.  In reaching that conclusion, the Louisiana Supreme Court noted:

> The defendant's right to know in advance of the trial sufficient
> particulars as to enable him to defend himself intelligently can be
> adequately protected by the bill of particulars and other discovery
> devices authorized and to be authorized.   Similarly, modern
> technology and the common practice of transcribing the evidence in
> criminal trials, now protects him against further prosecution for the
> crime for which tried by an indictment which, although indicating the
> specific crime charged, might be considered insufficient if strictly
> construed.

Id. at 517.

In the last reasoned state court judgment addressing petitioner's claim, the Louisiana

Fifth Circuit Court of Appeal found that petitioner's indictment was valid under state law, holding:

> By this assignment of error the Defendant in his pro se brief
> argues that the failure of the indictment to cite all essential elements
> of the crime resulted in an invalid and/or defective indictment and,
> therefore, the conviction must be reversed.

The time for testing the sufficiency of an indictment is before trial by a motion to quash or an application for a bill of particulars. State v. Gainey, 376 So.2d 1240, 1243 (La. 1979). Although counsel failed to file a motion to quash, he claims that he filed a bill of particulars and did, in fact, argue the motion prior to trial.[FN6] Therefore, his claim will be considered on appeal.

> [FN6] A copy of the bill of particulars is not found in the record.

An attack on the sufficiency of an indictment should be rejected unless the indictment failed to give fair notice of the offense charged or failed to set forth an identifiable offense. State v. Taylor, 781 So.2d at 1218 citing State v. Williams, 480 So.2d 721, 722 (La. 1985). The test to determine the sufficiency of a bill is whether it is misleading to the defendant. State v. Gaines, 97-672 (La.App. 5th Cir. 2/25/98), 707 So.2d 1354, 1358, writs denied, 98-1039 (La. 9/18/98), 724 So.2d 749, citing State v. Bouie, 598 So.2d 610, 612 (La.App. 4th Cir. 1992).

Article I, § 13 of the Louisiana Constitution requires that an indictment inform a defendant of the nature and cause of the accusation against him.

La.C.Cr.P. art. 464 provides:

> The indictment shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.

La.C.Cr.P. art. 465 authorizes the use of specific short form indictments in charging certain offenses, including second degree murder. The constitutionality of the short forms has been consistently upheld by the Louisiana Supreme Court. State v. Taylor, 781 So.2d at 1218 citing State v. Baylis, 388 So.2d 713, 718-719 (La. 1980) and State v. Liner, 373 So.2d 121, 122 (La. 1979). When those forms are used, it is intended that a defendant may procure details as to the

statutory method by which he committed the offense through a bill of particulars.  State v. Taylor, 781 So.2d at 1218 (citations omitted).

On February 18, 1999, the State charged the Defendant by grand jury indictment which read in pertinent part, "Randy J. Richthofen ... on or about the 2nd day of April ... 1998 with force and arms, in the Parish of Jefferson ... violated La. R.S. 14:30.1 in that he did commit second degree murder of a female juvenile." Accordingly, the Defendant was charged in compliance with La.C.Cr.P. art. 465(A)(32), which provides a short form indictment for second degree murder:  "A.B. committed second degree murder of C.D."

On July 15, 1999, defense counsel orally argued a motion for bill of particulars, requesting that the State inform her of the particular section of the statute with which the Defendant was charged.  The State informed the Defendant that he was charged with La. R.S. 14:30.1(A)(2)(b).  At the end of the lengthy discussion, defense counsel stated, "Okay. Your Honor, that's all I have for – as far as clearing up the answers to my motion for bill of particulars."

After a thorough review of the record, we find that the Defendant was sufficiently informed of the charge against him in the indictment and was not prejudiced by any defect in it at trial.

The Defendant cites United States v. Cabrera-Teran, 168 F.3d 141 (5th Cir. 1999) to support his argument.  In Cabrera-Teran, defendant was convicted of illegal reentry into the United States, a violation of 8 U.S.C.S. § 1326.  On appeal, he contended that the indictment failed to properly charge an offense.  The appellate court vacated the judgment of conviction and remanded, finding that the indictment was fatally defective in that it failed to charge that defendant had been arrested pursuant to the language of 8 U.S.C.S. § 1326.  The court found that a charge of arrest, as an element of the offense contemplated under § 1326 was required, even though the indictment cited the correct statute, and that statutory citations could not stand in the place of the inclusion of an element of the crime.

We find that Cabrera-Teran is distinguishable from the instant case.  In Cabrera-Teran, the indictment was inadequate because a charge of arrest, an essential element of the offense, was not cited in the indictment, whereas in the instant case, the indictment was adequate because the State charged the Defendant by using a short form indictment for second degree murder which was authorized by La.C.Cr.P. art. 465.  Therefore, Cabrera-Teran is inapplicable to the

instant matter.  We find no error in the form of the indictment used in
this case.  This assignment of error lacks merit.[22]

In the instant case, the indictment clearly alleged that petitioner committed second

degree murder on April 2, 1998.  As noted by the state court, any uncertainty arising from the use

of the short-form indictment was resolved to defense counsel's satisfaction at the hearing on July 15,

1999.[23]  It is beyond question that the indictment fairly informed the defendant of the charge against

him, did not prejudice him by surprise or lack of notice, and protected him against further

prosecution for the same crime, and, therefore, the indictment was not so fatally defective as to

deprive the trial court of jurisdiction under state law.  Accordingly, petitioner is not entitled to

federal *habeas corpus* relief based on this claim.

<u>Denial of Challenge for Cause</u>

Petitioner claims that the trial court improperly denied the defense's challenge for

cause of prospective juror Norma Baumann.  During the general voir dire, Baumann indicated that

it would difficult for her to be fair in light of the fact that the victim of the crime was a child.  Based

on that response, defense counsel challenged Baumann for cause, whereupon Baumann was

questioned individually.  That exchange was as follows:

---

[22]  <u>State v. Richthofen</u>, 803 So.2d at 192-93; State Rec., Vol. I of VIII.  The Louisiana Supreme
Court denied petitioner's related writ application without assigning reasons.  <u>State v. Richthofen</u>, 836
So.2d 57 (La. 2003) (No. 2002-KO-0206); State Rec., Vol. I of VIII.

[23]  As noted in the state court opinion, short form indictments have long been upheld by the
Louisiana Supreme Court as valid.  <u>See</u> <u>State v. Liner</u>, 373 So.2d 121, 122-23 (La. 1979).  Moreover,
the United States Fifth Circuit Court of Appeals has held that such indictments are not
unconstitutional on the ground that they fail to include an essential element of the crime.  <u>Liner v.
Phelps</u>, 731 F.2d at 1203-04.

THE COURT:

    Ms. Baumann, please join us.

(Whereupon, the following colloquy was reported at the bench:)

THE COURT:

    Hi, Ms. Baumann.

PROSPECTIVE JUROR BAUMANN:

    Hi.

THE COURT:

    I'm going to let Ms. Naquin ask you a couple of questions.

MS. MATTHEWS-NAQUIN [defense counsel]:

    Ms. Baumann, when you found out that this case involved a child and the death of a child, you explained to the court that you would have some difficulty sitting in a case like this, is that correct?

PROSPECTIVE JUROR BAUMANN:

    Uh-huh (affirmative response).

MS. MATTHEWS-NAQUIN:

    Okay, would that difficulty cause you to be prejudicial against the Defendant from the onset?

PROSPECTIVE JUROR BAUMANN:

    I don't know.  It's kind of hard to say.  I just feel that a child has no defense, whatsoever.

MS. MATTHEWS-NAQUIN:

    Do you feel like you could be fair to Mr. Richthofen?  I appreciate your honesty.

PROSPECTIVE JUROR BAUMANN:

    No, it would be very difficult for me, I think.

MS. MATTHEWS-NAQUIN:

    The court is interested in knowing whether or not you could put aside the personal feelings that you have, the emotions that you

have and sit, listen to just the evidence and testimony and then try to deliberate and reach a verdict?  Could you put aside those emotions?

PROSPECTIVE JUROR BAUMANN:
    I couldn't honestly tell you that I could.  It's just the way I feel about children.

THE COURT:
    Well, let me ask you a question.  You know, certainly, it's difficult for all of us.  I have children.  Ms. Naquin has children.  Mr. Bates has children.  And certainly whenever a child's involved, it's something that's distasteful.  You certainly don't want to necessarily have to be involved.  It's something hard to do.
    The question is whether or not you can listen to the evidence and the testimony that you hear in the courtroom and apply the instructions of law that the court gives you and reach a fair and impartial verdict based solely on the evidence, the testimony and the instructions of law?  I mean, certainly because it involves a child, you wouldn't automatically convict Mr. Richthofen just because it's a child.  Would you require the State to prove its case, the elements of the crime beyond a reasonable doubt?

PROSPECTIVE JUROR BAUMANN:
    Yes.

THE COURT:
    Any follow up questions?

MS. MATTHEWS-NAQUIN:
    No follow up questions.

THE COURT:
    Mr. Bates?

MR. BATES [prosecutor]:
    None.

THE COURT:
    Thank you, Ms. Baumann.
    The court is not going to excuse Ms. Baumann based on – for cause challenge.  She said that she could be fair and impartial and

after listening to the evidence, the testimony and instructions of law, reach a fair and impartial verdict based solely on the evidence, the testimony and the law. ...[24]

The Court acknowledges that "[t]he Sixth Amendment right to a fair trial includes the right to an impartial jury." Miniel v. Cockrell, 339 F.3d 331, 338 (5th Cir. 2003). "The standard for determining when a venire member may be excluded for cause is whether the prospective juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Soria v. Johnson, 207 F.3d 232, 242 (5th Cir. 2000) (internal quotation marks omitted).

In a federal *habeas corpus* proceeding, "[a] state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness." Miniel, 339 F.3d at 338-39; Soria, 207 F.3d at 242.   Therefore, where, as here, the state courts have denied a petitioner's claim regarding a challenge for cause, the petitioner is entitled to *habeas* relief only if he rebuts the state court's factual finding by clear and convincing evidence.  See Miniel, 339 F.3d at 340; Soria, 207 F.3d at 242.

On direct appeal, the Louisiana Fifth Circuit Court of Appeal rejected petitioner's claim, holding:

> By this assignment of error, defense counsel argues that the trial judge erred in denying his challenge for cause during voir dire of prospective juror, Norma Baumann (Baumann).  He claims that Baumann should have been excused for cause because her voir dire responses indicated that she could not be a fair and impartial juror in any homicide case in which a child was the victim.  The Defendant

---

[24]  State Rec., Vol. VII of VIII, transcript of March 14, 2000, pp. 94-97.

also contends that Baumann, under pressure by the trial judge to give the "correct" response, changed her answer regarding being able to objectively consider the evidence in a case involving a child, to give the response that the trial court was seeking.

La.C.Cr.P. art. 797 provides, in pertinent part, as follows:

> The state or the defendant may challenge a juror for cause on the ground that:
>
> * * * *
>
> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;-
>
> * * * *
>
> (4) The juror will not accept the law as given to him by the court;

A challenge for cause should be granted, even when a prospective juror declares her ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. State v. Allen, 95-1754 (La. 9/5/96), 682 So.2d 713; State v. Bailey, 97-302 (La.App. 5th Cir. 4/28/98), 713 So.2d 588, writ denied, 98-1458 (La. 10/30/98), 723 So.2d 971. The trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror, and such determinations will not be disturbed on appeal unless a review of the voir dire as a whole indicates an abuse of that discretion. State v. Lee, 93-2810 (La. 5/23/94), 637 So.2d 102; State v. Alberto, 95-540 (La.App. 5th Cir. 11/28/95), 665 So.2d 614, writ denied, 95-1677 (La. 3/22/96), 669 So.2d 1222, writ denied, 96-0041 (La. 3/29/96), 670 So.2d 1237.

To prove error warranting reversal of both the conviction and sentence, a defendant need only show that he exhausted all of his peremptory challenges and that the trial judge erroneously denied a

challenge for cause.  State v. Connolly, 96-1680 (La. 7/1/97), 700 So.2d 810.

In this case, the record shows that the Defendant used all twelve of his peremptory challenges.  Thus, the issue is whether the trial judge's refusal to remove the juror at issue was an abuse of discretion.

The Defendant contends that Baumann gave responses in voir dire that indicate that she could not be a fair and impartial juror in a homicide case in which a child was the victim. [FN4]

> [FN4] A review of the discussion at the bench among the trial judge, the prosecutor and defense counsel indicates that the court reporter apparently made a mistake when transcribing the testimony.  A review of the transcript indicates that Baumann's comments were attributed to Darla Laudumiey by the court reporter.   We have reviewed those responses in considering this issue.

Following questioning of Baumann by defense counsel, the prosecutor and the trial judge, the trial judge refused to excuse Baumann for cause because "she said that she could be fair and impartial and after listening to the evidence, the testimony and instructions of law, reach a fair and impartial verdict based solely on the evidence, the testimony and the law."  Defense counsel used a peremptory challenge to strike Baumann.

Based on our review of the entire voir dire, we find that the responses of Baumann, as a whole, indicated that she could have been a fair and impartial juror.  When the prosecutor asked Baumann if she would be able to put her emotions aside and make a "cold, unbiased opinion," she responded in the affirmative.  Further, when the trial judge asked Baumann if she would require the State to prove the elements of the crime beyond a reasonable doubt, she answered, "yes." Although some of Baumann's responses during voir dire could be viewed as questionable, standing alone and out of context, we find that the totality of her responses reveals that she would have been a

fair and impartial juror and the trial judge did not err in refusing the defense challenge for cause.  This assignment or error lacks merit.[25]

As noted, petitioner is entitled to federal *habeas* relief only if he rebuts the state court's factual findings regarding this claim by clear and convincing evidence.  See Miniel, 339 F.3d at 340; Soria, 207 F.3d at 242.  In the instant case, petitioner has clearly failed to meet that burden.  Accordingly, the claim must fail.

Evidentiary Rulings

Petitioner claims that the trial court erred in allowing the introduction into evidence of multiple photographs of the victim, hearsay statements, and irrelevant, inflammatory evidence regarding petitioner's conviction for battery of a child in an unrelated case.

Petitioner's first contention is that the trial court erred in allowing the prosecution to introduce twenty-four photographs of the victim taken prior to her injury.  He further claims that the trial court erred in allowing the admission of photographs showing the victim with "a red ear" and himself reflected in a mirror.  The Louisiana Fifth Circuit Court of Appeal rejected those claims on direct appeal, holding:

---

[25]  State v. Richthofen, 803 So.2d at 189-91; State Rec., Vol. I of VIII.  This Court notes that the error referenced by the state court in footnote 4 of the quoted passage is not evident in the transcript furnished to this Court.  That transcript reflects that both Darla Laudumiey and Norma Baumann expressed concern over whether they could be impartial due to the fact that the victim was a child, and both prospective jurors were individually questioned at the bench on that issue.  After Laudumiey's examination, she was excused for cause.  State Rec., Vol. VII of VIII, transcript of March 14, 2000, pp. 88-91.  After Baumann's examination, the judge denied the challenge for cause and the defense exercised a peremptory challenge.  State Rec., Vol. VII of VIII, transcript of March 14, 2000, pp. 94-98.  Nevertheless, despite the confusing footnote, a comparison of the opinion with the transcript makes it apparent that the state court was in fact reviewing Baumann's examination when deciding this claim.

By these assignments of error, the Defendant's counsel argues that the trial court erred by allowing the State to use multiple photographs of Brenda prior to her injury. He contends that, although the photographs were not gruesome, they were cumulative, highly prejudicial, and had no probative value. The Defendant claims that the excessive number of photographs were introduced simply to pander to the jury's emotions and not to prove the case. He argues that Brenda's ability to sit, hold a bottle, and behave as an eleven month old was not contested. The Defendant contends that the prosecutor not only introduced 24 photographs showing a happy baby, they also had two experts testify as to her therapy, mood and ability to function prior to the injury. He states that any argument that the photographs show that the brain injury was unrelated to her Adams Oliver Syndrome is also faulty because four medical doctors were allowed to testify and clarify that the syndrome did not explain the injury. The Defendant, in his pro se brief, argues that photograph number six, and the photograph that showed Brenda with a red ear, inflamed the jury and were inadmissible. He also argues that photograph number six did not show the Defendant holding Brenda as Boudreaux testified, but instead showed Defendant's image in a mirror. The Defendant contends that the photograph inflamed the jury, prejudiced him, was inadmissible, and used illegally in violation of his fundamental fair trial rights.

With some exceptions, all relevant evidence is admissible at trial. La. C.E. art. 402. Relevant evidence is that which tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. C.E. art. 401. The determination concerning relevancy of evidence is within the discretion of the trial judge whose rulings will not be disturbed in the absence of an abuse of discretion. State v. Winfrey, 97-427 (La.App. 5th Cir. 10/28/97), 703 So.2d 63, writ denied, 98-0264 (La. 6/19/98), 719 So.2d 481.

Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted, are generally admissible, provided that their probative value outweighs any prejudicial effect. State v. Jackson, 00-1014 (La.App. 5th Cir. 12/13/00), 778 So.2d 23, 31, citing State v. Glynn, 94-0332 (La.App. 1st Cir. 4/7/95), 653 So.2d 1288, writ denied, 95-1153 (La. 10/6/95), 661 So.2d 464. Photographic evidence is properly admitted unless it is so gruesome as to overwhelm the

jurors' reason and lead them to convict a defendant without sufficient evidence.  Moreover, the cumulative nature of photographic evidence does not render it inadmissible if it corroborates the testimony of witnesses on essential matters.  State v. Lane, 414 So.2d 1223 (La. 1982); State v. Miles, 402 So.2d 644 (La.1981).

Before allowing photographs of Brenda at trial, the trial judge looked at some of the photographs which the State wanted to present and excluded those which were not relevant or which were cumulative.  The trial judge ruled that the photographs admitted into evidence were relevant and showed different aspects of the child's life.  Although many of the photographs admitted into evidence were taken in the same time frame, the trial judge found that was acceptable considering that the child "only survived on this earth for eleven months."   A review of the record indicates that 17 photographs, State's exhibits one through 11, were taken prior to Brenda's April 1998 injury, and seven photographs, State's exhibits 21 through 27, were taken after the injury.  Of the approximately 50 photographs sought to be introduced into evidence, 24 were actually admitted into evidence.

A review of the photographs reveals that they are relevant and admissible, and their probative value is not substantially outweighed by the danger of unfair prejudice.  The photographs of Brenda before the injury demonstrate varying levels of interaction with people, and the ability to express emotions, stand, sit and hold things, and none of the photographs appear to be cumulative in the sense of describing those various events.  The photographs taken after the injury show Brenda sitting and laying down with a sad expression on her face.  The photographs corroborate the testimony of several witnesses, including Boudreaux, her mother, Harris, her physical therapist, and Stall, her early interventionist, and support the fact that Brenda was an active, happy baby before the injury and a listless, lethargic baby after the injury.  The photographs also corroborate the testimony of Drs. Ross and Steck and support the testimony that, at the hospital after the injury, Brenda was unresponsive and not interactive, and that Adams Oliver Syndrome did not cause her brain injury.  Based on the foregoing, we find that the trial court did not err in admitting the photographs into evidence.

The Defendant, in his pro se brief, argues more specifically that photograph number six and the photograph that showed Brenda with a red ear, inflamed the jury, were inadmissible, and prejudiced him.  He argues that photograph number six was not introduced to

show the Defendant holding Brenda as Boudreaux testified, but instead it was introduced to show the Defendant's image in a mirror. The Defendant contends that the photographs were inadmissible and used illegally in violation of his fundamental fair trial rights.

The Defendant did not lodge contemporaneous objections on these grounds during trial as required by La.C.Cr.P. art. 841 and, therefore, is precluded from raising these issues on appeal. State v. Styles, 96-897 (La.App. 5th Cir. 3/25/97), 692 So.2d 1222, 1227-1228, writ denied, 97-1069 (La. 10/13/97), 703 So.2d 609. The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem and to prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. Id.

However, even if we were to consider the Defendant's pro se assignment, we find no error in the admission of the photographs. First, there is some confusion as to which photographs the Defendant finds objectionable. While he refers only to photograph number six, he describes the picture of Brenda's injured ear and a picture of himself reflected in a mirror. Photograph number six is not of Brenda's ear or of a discernable view of the Defendant reflected in the mirror. The picture barely shows dark hair and a part of an arm in a mirror, but it does not show anyone's face and it is impossible to tell who the person is. The fact that an image was captured in the mirror does not render the photograph inflammatory or prejudicial. Rather, it is simply one of the photographs of Brenda prior to the injury. Second, if we consider the photographs of Brenda's bruised ear, we find that the photographs were relevant to show her condition in the hospital after her injury. They were not gruesome, nor do we find that the probative value was substantially outweighed by the prejudicial effect. Thus, we find that the photographs corroborate Boudreaux's testimony and were relevant to show Brenda's condition prior to and following her injury. These assignments of error lack merit.[26]

The United States Fifth Circuit Court of Appeals has held: "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." Little v.

---

[26] State v. Richthofen, 803 So.2d at 187-89; State Rec., Vol. I of VIII.

Johnson, 162 F.3d 855, 862 (5th Cir. 1998).  Therefore, to the extent that petitioner is arguing that the state courts merely misapplied state evidence law, his claim is not reviewable in this federal proceeding.

Moreover, to the extent that petitioner is arguing that the introduction of the photographs violated his federal constitutional rights, he has failed to demonstrate that he is entitled to *habeas* relief on that basis.  Even if the photographs were improperly admitted, that alone would not necessarily warrant *habeas* relief.  The United States Fifth Circuit Court of Appeals has noted:

> We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause.  The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.

Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); see also Little, 162 F.3d at 862 ("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted.").

In the instant case, even if the photographs were wrongfully admitted into evidence, *a fact petitioner has not established*, it nevertheless cannot said that those photographs played a crucial, critical, and highly significant role in his conviction in light of the evidence against him.  Accordingly, petitioner has failed to meet his burden to demonstrate that the admission of the photographs resulted in a denial of fundamental fairness.

For all of the foregoing reasons, petitioner has failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Applying the AEDPA's

deferential standard, this Court rejects petitioner's claims regarding the admission of the photographs into evidence.

As to petitioner's remaining challenges to the admission of other evidence, those claims, which were first asserted in the state post-conviction proceedings, were rejected on procedural grounds. The state district court found:

> In his Fifth assignment of error, defendant alleges that he was denied a fair trial when the State introduced Brittany's hearsay statements. The defendant's claim is an appealable issue and he is, thus, procedurally barred from raising this claim on post-conviction relief since he had the opportunity to do so on appeal. State v. Gaines, 97-1327 (La. App. 4 Cir. 9/19/97), 701 So.2d 688. Nevertheless, this Court will grant defendant thirty (30) days from the date of this order to state written reasons for his failure to raise this issue on appeal.
>
> In his Sixth assignment of error, defendant alleges that he was denied a fair and lawful trial when hearsay evidence was admitted into the record. The defendant's claim is an appealable issue and he is, thus, procedurally barred from raising this claim on post-conviction relief since he had the opportunity to do so on appeal. State v. Gaines, 97-1327 (La. App. 4 Cir. 9/19/97), 701 So.2d 688. Nevertheless, this Court will grant defendant thirty (30) days from the date of this order to state written reasons for his failure to raise this issue on appeal.
>
> ....
>
> In his Eighth assignment of error, defendant alleges that the State introduced irrelevant and inflammatory evidence unrelated to his case. The defendant's claim is an appealable issue and he is, thus, procedurally barred from raising this claim on post-conviction relief since he had the opportunity to do so on appeal. State v. Gaines, 97-1327 (La. App. 4 Cir. 9/19/97), 701 So.2d 688. Nevertheless, this Court will grant defendant thirty (30) days from the date of this order to state written reasons for his failure to raise this issue on appeal.
>
> In his Tenth assignment of error, defendant was [sic] denied a fair trial when the State introduced "gruesome and prejudicial" photographs. The defendant's claim is an appealable issue and he is, thus, procedurally barred from raising this claim on post-conviction

relief since he had the opportunity to do so on appeal.  State v. Gaines, 97-1327 (La. App. 4 Cir. 9/19/97), 701 So.2d 688. Nevertheless, this Court will grant defendant thirty (30) days from the date of this order to state written reasons for his failure to raise this issue on appeal.[27]

In response to that order, petitioner contended that the claims were not asserted on appeal because his appellate counsel was ineffective.  The state district court rejected that contention, and thus denied petitioner's claims based on the aforementioned procedural grounds, holding:

In his current motion, the defendant claims that he failed to raise the referenced claims due to the ineffective assistance of appellate counsel.  The defendant contends that he was depending on appellate counsel to perform in a professional manner as an advocate for his cause assigning all constitutional errors at his trial.  The defendant further contends that he was denied a right to a fair appeal since appellate counsel did not brief the assignments of errors presented in [his] claims ....

The Supreme Court of the United States established standards for the claim of ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  The test established by the Supreme Court provides that in order for a claim of ineffective assistance of counsel to prevail, the petitioner must show the counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment and that the deficient performance prejudiced the defense in that the errors were so serious as to deprive petitioner of a fair trial.  Furthermore, the Court in Strickland, established that the performance inquiry into a counsel's effectiveness must be that his assistance was "reasonable considering all the circumstances".  Id. at 689.  The Court went on to emphasize the "countless" ways to provide effective assistance and also cautioned a counsel's action being challenged that might be considered "sound trial strategy".  Id.

In the instant case, none of the defendant's claims seem to go beyond strategic choices made by his counsel at the time of the defendant's appeal.  The defendant's claims are essentially with his

---

[27]  State Rec., Vol. II of VIII, Order dated April 27, 2004.

counsel's decisions regarding his appeal. These are considered tactics for purposes of evaluating the performance of defendant's counsel. Thus, defendant's claim must fail because his counsel's action at trial was considered tactics and under the <u>Strickland</u> test, the defendant has failed to meet the two-prong test. Upon review, appellate counsel advised defendant that he may file a *pro se* supplemental briefs to the appellate court prior to oral arguments. Further, appellate counsel informed defendant that he is not allowed to go beyond the evidence already in the trial record. He also advised defendant that he may pursue a PCR if his appeal is unsuccessful. An examination of the record reveals that both appellate counsel and defendant filed briefs with the Fifth Circuit. Thus the defendant is not entitled to the relief sought.[28]

The Louisiana Fifth Circuit Court of Appeal found "no error" with respect to those rulings,[29] and the Louisiana Supreme Court denied a related writ application without assigning reasons.[30]

As previously noted:

A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.

<u>Finley v. Johnson</u>, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).

The procedural rule invoked with respect to the instant claims, i.e. that a post-conviction claim is waived if not asserted on direct appeal, is obviously independent of the merits of the federal claim. Therefore, the Court needs only to determine whether that rule was "adequate."

---

[28] State Rec., Vol. II of VIII, Order dated June 14, 2004.

[29] <u>Richthofen v. Cain</u>, No. 04-KH-866 (La. App. 5th Cir. July 23, 2004) (unpublished); State Rec., Vol. II of VIII.

[30] <u>State *ex rel.* Richthofen v. State</u>, 904 So.2d 687 (La. 2005) (No. 2004-KH-2409); State Rec., Vol. II of VIII.

"The [procedural bar] doctrine presumes that a state procedural ground is adequate ... and, ordinarily, the burden is on the habeas petitioner to demonstrate otherwise." Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999).  In order to establish that a state procedural rule is not "adequate," a petitioner bears the burden of showing that the state did not strictly or regularly follow the procedural rule. Stokes v. Anderson, 123 F.3d 858, 860 (5th Cir. 1997).  Here, petitioner clearly has not met his burden, in that he makes no attempt whatsoever to establish that the rule was not strictly or regularly followed.[31]  Therefore, this Court need only determine whether petitioner has demonstrated "cause and prejudice" and whether the failure to address the claim would result in a "fundamental miscarriage of justice." Hughes, 191 F.3d at 614.  In the instant case, petitioner demonstrates neither.

"To establish cause for a procedural default, there must be something *external* to the petitioner, something that cannot fairly be attributed to him." Johnson v. Puckett, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted) (emphasis in original).  As noted, petitioner claims that his counsel was ineffective in failing to raise the claims on appeal.  In some instances, ineffective assistance of counsel can constitute cause for a procedural default. See Romero v. Collins, 961 F.2d 1181, 1183 (5th Cir. 1992).  However, as noted, the state court expressly found that petitioner's appellate counsel was not ineffective.  For the following reasons, this Court agrees.

---

[31]  Moreover, it is clear that the procedural rule in question, i.e. that a claim regarding an appealable issue is waived if not asserted on appeal, is an independent and adequate state court ground. See Bell v. Cain, Civil Action No. 02-0259, 2002 WL 31002831, at *4 (E.D. La. Aug. 29, 2002) (Africk, J.); see also Gilkers v. Cain, Civil Action No. 05-841, 2006 WL 1985969, at *2 (E.D. La. May 30, 2006) (Duval, J.).

- 41 -

In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. See id. at 697.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation. Briesno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000). Therefore, petitioner must demonstrate a reasonable probability that if appellate counsel's performance had not been deficient in the manner

claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  Briesno, 274 F.3d at 210.

Petitioner bears the burden of proof when asserting an ineffective assistance of counsel claim.  Petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong.  Strickland, 466 U.S. at 697.

A claim of ineffective assistance of counsel is a mixed question of law and fact. Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Therefore, this Court must defer to the state court on such claims unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Petitioner claims that his appellate counsel was ineffective in failing to assert these claims, as well as numerous other claims, on appeal.  Based on petitioner's contention, as well as his instant *habeas* petition asserting a veritable mountain of claims, it is evident that a practical reality escapes him:  it is often an unwise tactic to assert every conceivable claim.  As the United States Supreme Court has noted, "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  Jones v. Barnes, 463 U.S. 745, 751-52 (1983).  Far from evidencing ineffectiveness, an appellate counsel's restraint often benefits his client

because "a brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions." Id. at 753.

Petitioner's appellate counsel asserted a number of claims on appeal.  He may well have believed, as does this Court, that petitioner would not have benefitted from a dilution of the focus and clarity of the appeal by including these weaker evidentiary claims.  And certainly, even if petitioner could demonstrate that counsel performed deficiently in omitting these claims, he has not shown resulting prejudice because he has fallen far short of demonstrating that any of the errors were so egregious that they would have resulted in the appellate court reversing or vacating his conviction.[32]  Accordingly, he has not meet his burden to establish that his appellate counsel was in fact ineffective.

Because the Court finds that petitioner has failed to establish that his counsel was ineffective, and because he has failed to show any other valid cause for his procedural default of these claims, the claims are barred in this federal proceeding unless he can show that a miscarriage of justice would result.  In that the Court has already determined that he has not and cannot make such a showing in this case,[33] the claims are barred from federal review.

---

[32]   To the contrary, it is evident that petitioner has failed to demonstrate that the underlying claims have any merit whatsoever.  As to claims regarding the admission of the videotape of Brittany's interview and the purported hearsay statements, those claims, as noted later in this opinion, have no merit.  That evidence was correctly admitted to impeach Brittany's trial testimony.  See pages 75-77. of this opinion.  As to the admission of the "other crimes" evidence, the state courts, in pretrial rulings, had already held that the evidence was in fact admissible.  See pages 77-78 of this opinion. As to the admission of the allegedly "gruesome and prejudicial" photographs, petitioner has failed to establish that any such photographs were in fact admitted.  See page 79 of this opinion.

[33]   See pages 22-23 of this opinion.

<u>False Testimony</u>

Petitioner next claims that the prosecutor knowingly used false testimony.  That claim, which was first asserted in the state post-conviction proceedings, was likewise rejected on procedural grounds.  The state district court found:

> In his Twelfth assignment of error, defendant alleges that he was denied a fair trial due to prosecutor misconduct created through the knowing use of false testimony ....  The defendant's [claim is] an appealable issue and he is, thus, procedurally barred from raising this claim on post-conviction relief since he had the opportunity to do so on appeal.  <u>State v. Gaines</u>, 97-1327 (La. App. 4 Cir. 9/19/97), 701 So.2d 688.  Nevertheless, this Court will grant defendant thirty (30) days from the date of this order to state written reasons for his failure to raise this issue on appeal.[34]

In response to that order, petitioner again contended that the claim was not asserted on appeal because his appellate counsel was ineffective.  The state district court again rejected that contention and thus denied petitioner's claim based on the aforementioned procedural ground.[35]  The Louisiana Fifth Circuit Court of Appeal found "no error" with respect to those rulings,[36] and the Louisiana Supreme Court denied a related writ application without assigning reasons.[37]

As previously noted:

---

[34]  State Rec., Vol. II of VIII, Order dated April 27, 2004.

[35]  State Rec., Vol. II of VIII, Order dated June 14, 2004.  <u>See</u> footnote 28 and accompanying text.

[36]  <u>Richthofen v. Cain</u>, No. 04-KH-866 (La. App. 5th Cir. July 23, 2004) (unpublished); State Rec., Vol. II of VIII.

[37]  <u>State ex rel. Richthofen v. State</u>, 904 So.2d 687 (La. 2005) (No. 2004-KH-2409); State Rec., Vol. II of VIII.

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).

For the reasons previously set forth in this opinion, the Court finds that the procedural rule invoked with respect to the instant claim, i.e. that a post-conviction claim is waived if not asserted on direct appeal, is an adequate and independent state procedural ground to support the application of a procedural bar.[38]  Accordingly, this Court may proceed directly to a determination as to whether petitioner has established "cause and prejudice" with respect to his default.

Again, the only "cause" identified by petitioner is his assertion that his counsel was ineffective in failing to assert the claim on appeal.  As noted, the state courts rejected that contention,[39] as does this Court.  As the Court previously explained in this opinion, appellate counsel is not ineffective when he asserts on appeal only the strongest claim or claims; in fact, quite the opposite.  Counsel performs a disservice to his client when he asserts every possible claim regardless of its true merit, thereby diluting the power and force of the stronger claims by burying them in a mound of weaker ones.  This claim regarding the alleged use of false testimony would certainly have

---

[38]  See pages 40-41 of this opinion.

[39]  See pages 39-40 of this opinion.

been a weak and distracting claim.[40]  Therefore, counsel was not deficient in failing to assert it on

appeal, and petitioner was in no way prejudiced by that action.

Because petitioner has not established "cause and prejudice" for his default, his claim

is barred in federal court unless he demonstrates that the application of the bar will result in a

fundamental miscarriage of justice.  In that the Court has already determined that he has not and

cannot make such a showing in this case,[41] his claim is barred from federal review.

Closing Argument

Petitioner claims that the prosecutor made an improper closing argument.  On direct

appeal, the Louisiana Fifth Circuit Court of Appeal rejected that claim, holding:

> By this assignment of error, defense counsel argues that in the
> State's rebuttal closing argument, the prosecutor became emotional
> and cried, which prejudiced the Defendant and caused the jury to
> identify with the prosecutor and in an effort to comfort him, side with
> his version of the case.  The Defendant contends that the trial court
> should have either admonished the jury pursuant to La.C.Cr.P. art.
> 771 after the display of emotion or granted a mistrial.
>
> Because Defendant failed to lodge a contemporaneous
> objection on this ground during trial as required by La.C.Cr.P. art.
> 841 [FN5], he is precluded from raising this issue on appeal.  State v.
> Styles, 96-897 (La.App. 5th Cir. 3/25/97), 692 So.2d 1222,
> 1227-1228, writ denied, 97-1069 (La. 10/13/97), 703 So.2d 609.  The
> purpose of the contemporaneous objection rule is to put the trial judge
> on notice of an alleged irregularity so that he may cure the problem
> and prevent a defendant from gambling for a favorable verdict and
> then resorting to appeal on errors that might easily have been
> corrected by an objection.  Id.

---

[40]   As noted on page 77 of this opinion, petitioner has failed to demonstrate that the prosecution
knowingly used false evidence.

[41]   See pages 22-23 of this opinion.

[FN5] La.C.Cr.P. art. 841 provides in pertinent part:

A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.

Even though the Defendant did not lodge a contemporaneous objection, he raised this issue in the trial court in his motion for a new trial which was denied. The trial judge's reasons for denial of the motion provide this Court with a clearer understanding of what occurred during this case:

With regard to the emotion during the close, it was a very emotional case. There's no doubt about that. Anytime a case involves the death of an eleven year old [sic] baby, emotions are invoked. There were a number of times during the trial that were very emotional and the Court did note that jurors became emotional at certain times of the trial. With regard specifically to Mr. Bates' closing argument and the fact that at the end of his closing argument he cried, the Court does not feel that there was any attempt on Mr. Bates to purposely express that emotion. It was something that he was overcome with at the close of his argument. Before Mr. Bates got to that point in his argument, as a matter of fact, there were a number of jurors who had broken down into tears. I would mention for the record that immediately after Mr. Bates' closing argument the Court took a recess in order to allow everyone to regain their composure and to calm down. And this break was a break that lasted for some period of time, went back to counsel and we again reviewed the jury instructions and the verdict form. The jury instructions were read to jury after this break. And after both the jurors and everyone else who was participating in the trial had an opportunity to become calm and regain any composure that may have been lost during closing arguments, I'd also mention that during the Court's instruction to the jury that the Court did instruct the jury that their verdict must be based upon the facts and the evidence in this

- 48 -

case. And that they should apply the instruction of the jury – excuse me, instruction of the Court in reaching their verdict by applying those instruction to the facts and the evidence, that their verdict would not be based on prejudice, passion, sympathy, or public opinion. With all of that said, the Court does hereby deny the motion for new trial.

No reported cases could be found where a prosecutor cried during closing argument. However, in <u>State v. Domangue</u>, 350 So.2d 599 (La. 1977), the Louisiana Supreme Court deemed a mistrial unnecessary when a rape victim's spouse began crying during closing arguments and before being escorted outside. Similarly, in <u>State v. Hopkins</u>, 626 So.2d 820 (La.App. 2 Cir. 1993), the victim's family appeared upset and cried during closing arguments. The trial judge denied a mistrial and did not immediately admonish the jury. She did later charge them not to be influenced by sympathy, passions, prejudice, or public opinion.

In the instant case, the trial judge took a lengthy recess to allow everyone to regain their composure and he instructed the jury not to base their verdict on prejudice, passion, sympathy or public opinion. A mistrial was not requested at the time of the occurrence. Even if we view this assignment of error as a complaint regarding the trial court's denial of a new trial, we find no reversible error presented by this argument. This assignment of error lacks merit.[42]

To the extent that petitioner is arguing that the state courts misapplied the applicable state laws regarding the granting of new trials, petitioner would not be entitled to federal *habeas corpus* relief based on any such error. "'[I]t is not the province of a federal *habeas* court to reexamine state-court determinations on state-law questions.'" <u>Trevino v. Johnson</u>, 168 F.3d 173, 184 (5th Cir. 1999) (quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991)). Federal *habeas corpus* relief may be granted only to remedy violations of the Constitution and laws of the United States;

---

[42] <u>State v. Richthofen</u>, 803 So.2d at 191-92; State Rec., Vol. I of VIII.

mere violations of state law will not suffice.  28 U.S.C. § 2254; <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1983).

To the extent that petitioner is arguing that the prosecutor's conduct was so egregious that it violated petitioner's federal constitutional rights, this Court rejects that claim for the following reasons.

Because it is presumably uncommon for a prosecutor to cry during arguments to the jury, there is not surprisingly a dearth of case law addressing such a circumstance.[43]  However, in the analogous situation where the prosecutor is accused of having made allegedly prejudicial or otherwise improper comments, the United States Fifth Circuit Court of Appeals has held:

> Even if ... [a] prosecutor's remarks [are] improper, prosecutorial remarks are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair. Such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.

<u>Harris v. Cockrell</u>, 313 F.3d 238, 245 (5th Cir. 2002) (internal quotation marks, ellipsis, and footnote omitted); <u>see also</u> <u>Jones v. Butler</u>, 864 F.2d 348 (5th Cir. 1989).  In other words, a prosecutor's

---

[43]   It is nevertheless noted that, in each of the cases which the undersigned has located regarding that situation, relief was denied to the criminal defendant who argued that he was prejudiced by the prosecutor's crying.  <u>State v. Flannery</u>, No. 03-CA-24, 2005 WL 750077, at *8 (Ohio App. 5 Dist. Apr. 1, 2005) (unpublished); <u>Wolfe v. State</u>, 998 P.2d 385, 388-89 (Wyo. 2000); <u>Hill v. State</u>, 64 Ark. App. 31, 35-36, 977 S.W.2d 234, 236-37 (1998); <u>Gibbins v. State</u>, 229 Ga. App. 896, 900, 495 S.E.2d 46, 51 (1997); <u>Coburn v. State</u>, 461 N.E.2d 1154, 1159 (Ind. App. 2 Dist. 1984).

remarks warrant *habeas* relief only if they were "a crucial, critical, highly significant factor upon which the jury based its verdict."  Harris, 313 F.3d at 245.

In the instant case, the trial judge, who was in the best position to evaluate the situation, indicated that he believed that the prosecutor's actions were not premeditated, and petitioner has presented no evidence to the contrary.  Additionally, the trial court mitigated any possible prejudice by calling the recess and instructing the jurors that their verdict was to be based solely on the evidence and the law.  In light of those facts, as well the evidence of petitioner's guilt, this Court finds that the prosecutor's inadvertent and understandable demonstration of emotion was not a crucial, critical, highly significant factor upon which the jury based its verdict.

Petitioner has failed to demonstrate that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects that claim.

<u>Jury Instructions</u>

Petitioner claims that the trial court erred in giving an erroneous jury instruction regarding the burden of proof and in not giving a limiting jury instruction on "other crimes" evidence.

The claim regarding the allegedly erroneous jury instruction was first asserted in the state post-conviction proceedings and was rejected on procedural grounds.  The state district court found:

In his Eleventh assignment of error, defendant was [sic] denied due process when the judge instructed the jury to use a mandatory presumption instruction and shifted the burden of proof as to intent from the State to the Defendant. ... The defendant's claim is an appealable issue and he is, thus, procedurally barred from raising this claim on post-conviction relief since he had the opportunity to do so on appeal. State v. Gaines, 97-1327 (La. App. 4 Cir. 9/19/97), 701 So.2d 688. Nevertheless, this Court will grant defendant thirty (30) days from the date of this order to state written reasons for his failure to raise this issue on appeal.[44]

In response to that order, petitioner again contended that the claim was not asserted on appeal because his appellate counsel was ineffective. The state district court again rejected that contention and thus denied petitioner's claim based on the aforementioned procedural ground.[45] The Louisiana Fifth Circuit Court of Appeal found "no error" with respect to those rulings,[46] and the Louisiana Supreme Court denied a related writ application without assigning reasons.[47]

As previously noted:

A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).

---

[44] State Rec., Vol. II of VIII, Order dated April 27, 2004.

[45] State Rec., Vol. II of VIII, Order dated June 14, 2004. See footnote 38 and accompanying text.

[46] Richthofen v. Cain, No. 04-KH-866 (La. App. 5th Cir. July 23, 2004) (unpublished); State Rec., Vol. II of VIII.

[47] State ex rel. Richthofen v. State, 904 So.2d 687 (La. 2005) (No. 2004-KH-2409); State Rec., Vol. II of VIII.

For the reasons previously set forth in this opinion, the Court finds that the procedural rule invoked with respect to the instant claim, i.e. that a post-conviction claim is waived if not asserted on direct appeal, is an adequate and independent state procedural ground to support the application of a procedural bar.[48]  Accordingly, this Court may proceed directly to a determination as to whether petitioner has established "cause and prejudice" with respect to his default.

Again, the only "cause" identified by petitioner is his assertion that his counsel was ineffective in asserting the claim on appeal.  As noted, the state courts rejected that contention,[49] as does this Court.  Petitioner's claim regarding the jury instructions would certainly have been a weak and distracting claim.[50]  Therefore, counsel was not deficient in failing to assert it on appeal, and petitioner was in no way prejudiced by that action.

Because petitioner has not established "cause and prejudice" for his default, his claim is barred in federal court unless he demonstrates that the application of the bar will result in a fundamental miscarriage of justice.  In that the Court has already determined that he has not and cannot make such a showing in this case,[51] his claim is barred from federal review.

As to petitioner's claim that the trial judge erred in not giving a limiting jury instruction on "other crimes" evidence, the state district court rejected that post-conviction claim on the merits, holding:

---

[48]  See pages 40-41 of this opinion.

[49]  See pages 39-40 of this opinion.

[50]  As noted on pages 85-86 of this opinion, the jury instruction at issue was in fact proper.

[51]  See pages 22-23 of this opinion.

In his second assignment of error, defendant alleges that the trial court erred by not limiting jury instructions on other crime evidence. The court in <u>State v. Lennon</u>, 661 So.2d 1047, 95-0402 (La. App. 4 Cir. 9/15/95) addressed the issue of unconstitutional jury instructions. In its decision, the Court held that the it [sic] must be determined whether it is reasonably likely that the jury applied the challenged instruction in an unconstitutional manner, not whether it is *possible* that the jury misapplied the instruction.

In the instant matter, defendant had made numerous speculative statements about the jury's level of comprehension regarding the jury instructions. However, he has not provided this Court with evidence to suggest that there is a reasonable likelihood that the jury applied the instructions in an unconstitutional manner. The defendant bases his entire argument on speculation. Therefore, the defendant has failed to meet his burden of proof in this claim. Thus, defendant is not entitled to the relief sought.[52]

The Louisiana Fifth Circuit Court of Appeal found "no error" with respect to that ruling,[53] and the Louisiana Supreme Court denied a related writ application without assigning reasons.[54]

With respect to *habeas corpus* claims challenging jury instructions, the United States Fifth Circuit Court of Appeals has held:

[A petitioner challenging the adequacy of jury instructions] faces a extraordinarily heavy burden. Improper jury instructions in state criminal trials do not generally form the basis for federal habeas relief. The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of the state court's judgment is even greater than the showing required to establish plain error on direct appeal.

---

[52] State Rec., Vol. II of VIII, Order dated April 27, 2004.

[53] <u>Richthofen v. Cain</u>, No. 04-KH-866 (La. App. 5th Cir. July 23, 2004) (unpublished); State Rec., Vol. II of VIII.

[54] <u>State *ex rel.* Richthofen v. State</u>, 904 So.2d 687 (La. 2005) (No. 2004-KH-2409); State Rec., Vol. II of VIII.

Tarpley v. Estelle, 703 F.2d 157, 159 (5th Cir. 1983) (internal quotation marks and citations omitted);

see also Galvan v. Cockrell, 293 F.3d 760, 764-65 (5th Cir. 2002).  Specifically, *habeas* relief will

not be warranted on such a claim unless the error was "so egregious as to rise to the level of a

constitutional violation or so prejudicial as to render the trial itself fundamentally unfair."  Tarpley,

703 F.2d at 159 (internal quotation marks, citations, and footnote omitted).  Moreover, a federal

*habeas* court must

> pay careful attention to the words actually spoken to the jury, for
> whether a defendant has been accorded his constitutional rights
> depends on the way in which a reasonable juror could have
> interpreted the instruction.  And we are mindful that a single
> instruction to the jury may not be judged in artificial isolation, but
> must be viewed in the context of the entire charge.

Id. at 160 (internal quotation marks and citations omitted).

In the instant case, the record reflects that, contrary to petitioner's contentions, the

jurors were in fact given limiting instructions regarding their consideration of "other crimes"

evidence.  They were instructed:

> You have heard evidence that the defendant previously
> committed acts similar to the one charged in this case.  You may not
> use this evidence to decide whether the defendant carried out the acts
> involved in the crime charged here.  However, if you are convinced
> beyond a reasonable doubt, based on other evidence introduced, that
> the defendant did carry out the acts involved in the crime charged
> here, then you may use this evidence concerning previous acts to
> decide proof of motive, opportunity, intent, preparation, plan,
> knowledge, identity, absence of mistake, or accident.
> Remember, even if you find that the defendant may have
> committed similar acts in the past, this is not evidence that he
> committed such an act in this case.  The defendant is on trial only for

> the crime charged.  You may not convict a person simply because you
> believe he may have committed similar acts in the past.[55]

Those instructions conform to Louisiana evidence law, which expressly provides that, although

evidence of other crimes "is not admissible to prove the character of a person in order to show that

he acted in conformity therewith," such evidence is admissible "for other purposes, such as proof

of motive, opportunity, intent, preparation, plan, knowledge identity, absence of mistake or accident

...." La. Code Evid. art 404(B).  Accordingly, because the instructions on this issue were given and

were accurate, petitioner's claim necessarily fails.

<u>Sufficiency of the Evidence</u>

Petitioner claims that there was insufficient evidence to support his conviction.  The

United States Fifth Circuit Court of Appeals has noted that claims of insufficient evidence are to be

analyzed pursuant to the standard set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979):

> In considering challenges to the sufficiency of evidence in
> habeas proceedings, "the relevant question is whether, after viewing
> the evidence in the light most favorable to the prosecution, any
> rational trier of fact could have found the essential elements of the
> crime beyond a reasonable doubt."

<u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir. 2001) (quoting <u>Jackson</u>, 443 U.S. at 319).  "The

<u>Jackson</u> inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence

determination, but rather whether it made a *rational decision* to convict or acquit.'" <u>Santellan</u>, 271

F.3d at 193 (quoting <u>Herrera v. Collins</u>, 506 U.S. 390, 402 (1993)) (emphasis added).

---

[55]   State Rec., Vol. III of VIII, Criminal Charges, pp. 7-8.

A sufficiency of the evidence argument presents a mixed question of law and fact. Taylor v. Day, Civil Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000). Therefore, this Court must defer to the state court unless its decision regarding the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected petitioner's challenge to the sufficiency of the evidence, holding:

> By these assignments of error, the Defendant argues in both the counseled brief and his pro se brief that the evidence was insufficient to support his conviction for second degree murder, because the State failed to prove, beyond a reasonable doubt, that he shook Brenda and caused her death.
>
> In reviewing the sufficiency of the evidence, due process requires the reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. The actual trier of fact is presumed to have acted rationally until it appears otherwise. State v. Mussall, 523 So.2d 1305 (La. 1988).
>
> In the instant case, the Defendant was convicted of second degree murder, a violation of La. R.S. 14:30.1, which provides in pertinent part:
>
> > A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2)(b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.

In order to convict the Defendant of second degree murder pursuant to La. R.S. 14:30.1(A)(1), the state must prove (1) the killing and (2) specific intent to kill or to inflict great bodily harm. State v. Williams, 97-1135 (La.App. 5th Cir. 5/27/98), 714 So.2d 258, 263.

Specific criminal intent is "that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). The determination of specific criminal intent is a question of fact. State v. Seals, 95-0305 (La. 11/25/96), 684 So.2d 368, 373, cert. denied, Seals v. Louisiana, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Lewis, 97-160 (La.App. 5th Cir. 7/29/97), 698 So.2d 456, 459, writ denied, 97-2381 (La. 3/27/98), 716 So.2d 881. Specific intent may be inferred from the circumstances and the actions of the defendant. Seals, 684 So.2d at 373; Lewis, 698 So.2d at 459.

In order to convict the Defendant of second degree murder pursuant to La. R.S. 14:30.1(A)(2)(b), the State must prove that the death of Brenda occurred while the Defendant was engaged in the perpetration of cruelty to juveniles.

Cruelty to juveniles is set forth in La. R.S. 14:93(A) and it provides that cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect of a child whereby unjustifiable pain or suffering is caused to the child. The term "intentional" within the meaning of this statute, requires general criminal intent to cause a child unjustifiable pain and suffering. State v. Cortez, 96-859 (La.App. 3rd Cir. 12/18/96), 687 So.2d 515, 519, citing State v. Morrison, 582 So.2d 295 (La.App. 1st Cir. 1991). Mistreatment as used in this statute means "abuse." State v. Cortez, 687 So.2d at 519, citing State v. Comeaux, 319 So.2d 897, 899 (La. 1975).

Thus, in order for the State to prove that the Defendant was guilty of second degree murder pursuant to La. R.S. 14:30.1(A) or (2)(b), it had to establish either (1) that the Defendant intentionally mistreated or neglected the child, or (2) that the Defendant was criminally negligent in his mistreatment or neglect of the child. To

be criminally negligent in his mistreatment or neglect of the child, the defendant must have such disregard for the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.  State v. Porter, 99-1722 (La.App. 3rd Cir. 5/3/00), 761 So.2d 115, 123; see La. R.S. 14:12.

In a case involving circumstantial evidence, La. R.S. 15:438 provides that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Captville, 448 So.2d 676, 678 (La. 1984); State v. Wooten, 99-181 (La.App. 5th Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La. 1/14/00), 753 So.2d 208. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt.  State v. Ortiz, 96-1609 (La. 10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).

In the instant case, the Defendant argues that the evidence was insufficient to convict him of second degree murder.  Specifically, he contends that there was no direct evidence to convict him of the crime and that the only direct evidence was recanted by Brittany on the stand at trial.  The Defendant claims that Brittany said on the videotape that he had shaken Brenda only because her mother, Avila, had threatened to beat her and feed her dog food.  The Defendant argues that when Brittany was out of harm's way at trial, she was able to tell the truth that the Defendant had not shaken Brenda.  The Defendant claims that Avila was not telling the truth when she testified that Brittany told her on the night which Brenda went into the hospital that her father had shaken her and that she was sick.  The Defendant claims that this story is unbelievable in that Brittany would not have known what was wrong with Brenda before the doctors did.

The Defendant also claims that Boudreaux was being less than truthful when she testified that Brenda only cried when the Defendant came into the room, since Stall testified that Brenda cried a fearful cry every time she saw her during the last two visits.  The Defendant notes that the testimony showed that Brenda was lethargic and sick during the last two weeks of March, and that she didn't suddenly get sick the day after the Defendant stayed home alone with her.  The Defendant argues that Boudreaux's testimony was inconsistent.  He states that Boudreaux testified that Brenda always cried when he was around. However, Boudreaux testified that she left Brenda alone with

the Defendant while bathing Brittany and did not hear crying or fussing.  The Defendant, in his brief by counsel, claims that all reasonable hypotheses of innocence were not excluded at trial and that the State failed to prove that the Defendant harmed Brenda in any way.  The Defendant, in his pro se brief, also argues that the State failed to exclude every reasonable hypothesis of innocence and, therefore, his conviction should be vacated.

A review of the record indicates that the evidence was sufficient under the Jackson standard to convict the Defendant of second degree murder.  Boudreaux testified that she left Brenda in the Defendant's care to go to the hospital and that the next morning Brenda didn't wake up as usual.  Drs. Ross, Steck and Benton all agreed that Brenda had Shaken Baby Syndrome.  Dr. Ross said the injury occurred 24 to 72 hours prior to her acute deterioration, and that the acute deterioration occurred a day or two after her admission. Drs. Steck and Benton confirmed the time frame.  Dr. Benton testified that the act of shaking a child is a violent one and that it would have taken "quite violent or considerable force" to shear the blood vessels in Brenda's brain and eyes.  The doctors also testified that there was subacute fluid which had probably occurred less than a week or two prior to her acute deterioration.  Dr. Garcia testified that Brenda's death was a homicide and that Shaken Baby Syndrome was her primary diagnosis on a list of possible mechanisms.  The testimony of Boudreaux, Stall and Gros indicate that Brenda was a normal, functioning baby before the injury and a listless, lethargic baby after the injury.  The doctors testified that her Adams Oliver Syndrome did not cause the brain injury which led to her death.

Although there was no direct evidence that the Defendant shook Brenda and caused her death, it is reasonable to infer that he committed the crime.  The testimony indicates that the Defendant was alone with Brenda during the pertinent time frame and had the opportunity to shake her.  On the night before Brenda was taken to the hospital, the Defendant, Boudreaux, and Brittany were at home with Brenda.  The testimony from Stall and Gros was that Boudreaux was a good mother, took excellent care of Brenda, always participated in her numerous physical therapy sessions and always kept her appointments with the therapists.  There was no testimony at trial that Boudreaux was a bad mother or that she had ever mistreated Brenda. Based on the testimony at trial, the jury could have found that Boudreaux was not responsible for her child's death.  Dr. Benton testified that the youngest perpetrator on record of shaking a baby was

thirteen years of age, and that it would have taken considerable force to cause Brenda's injuries.  Therefore, the jury could have found that Brittany, who was six years old at the time of the incident, was too young to have committed this crime.  Brittany testified that no one ever babysat her and Brenda other than the Defendant.  Therefore, there was ample evidence presented to support the jury's conclusion that the Defendant was the person who shook Brenda.

Additional evidence also supported the verdict.   The Defendant and Boudreaux moved in together in late January of 1998 and lived together in February and March of 1998.  According to Boudreaux, the Defendant had been working two jobs when they moved in together, but had quit one of the jobs in March, "a couple of weeks before everything started happening."   The testimony showed that the Defendant behaved in unusual ways.  Boudreaux testified that the Defendant would take the baby at night and put her in the front room.  She stated that she saw the Defendant become angry with Brenda often, between five and ten times, and in response, he would put her in bed and put blankets around her or on top of her.  Boudreaux stated that on one occasion, after Boudreaux had bathed Brittany and had come out of the room, she saw Brenda in the Defendant's arms.  She was not alert, so the Defendant put her in cold water and then Brenda started crying.  Boudreaux testified that, "it looked like he knew what he was doing."  Boudreaux testified that in the middle of March, every time the Defendant would enter the room, or go near Brenda, she would stop whatever she was doing, stare for a second and cry.  She stated that Brenda never acted that way when she or anyone else was caring for her.  Boudreaux also testified that Brenda never had problems while they lived with her family after Brenda's birth or with Boudreaux's aunt through January of 1998.

The evidence indicates that the Defendant had violent propensities.  Boudreaux testified that on one occasion, the Defendant punched her, choked her, pulled her hair, beat her up and she blacked out.  Boudreaux testified that she tried to leave the Defendant once, but he took something from her car so that it wouldn't start.  She stated that she didn't call the police because the Defendant had threatened her and she was scared.  Avila, the Defendant's previous girlfriend and Brittany's mother, testified that the relationship between her and the Defendant failed because it was violent, and that she was sometimes afraid of him.  The State introduced evidence which showed that the Defendant and his former wife, Tracy Allo, pled guilty under <u>Alford</u> to the crime of simple battery for injuries

sustained by Allo's daughter, a juvenile.  Based on the foregoing, evidence was presented to the jury to show that the Defendant was a violent person and that he used violent force to inflict the injury upon Brenda.

There was also evidence tending to show that the Defendant had a guilty conscience or that he was aware he was responsible for Brenda's injuries.  On the day Boudreaux took Brenda to the hospital, the Defendant dropped Brittany at Avila's house and told Avila, "take care of my daughter no matter what happens."  When the Defendant went to the hospital, he called his friend, Johnson, and told him to get his car with his jewelry in the trunk and take it to his mother's house. He did all of this before being questioned by the police and when the doctors still thought that Brenda was dehydrated.  Boudreaux received a call from Dr. Ross at 4:30 a.m. or 5:00 a.m. the day after Brenda was admitted, and Dr. Ross told her that she was not responding and he wasn't sure why.  The Defendant, who was engaged to be married to Boudreaux, did not accompany her to the hospital, but instead just dropped her off.  Boudreaux testified that the Defendant told her to lie to the police and tell them that she lived with her aunt and not him.  Based on all of the above, the jury could have concluded that the Defendant had a guilty conscience, because he knew what he had done to Brenda and what he probably had been doing to her in the past.

Finally, Brittany testified that the Defendant never shook Brenda.  However, she was impeached with a videotape which showed that she had told a woman that the Defendant had shaken Brenda.  The State also impeached Brittany through the testimony of her mother, Avila, who testified that Brittany had told her that the Defendant shook Brenda.

The Defendant, in his pro se brief, contends, *inter alia*, that Brenda's Adams-Oliver Syndrome, combined with incorrect medical diagnoses, resulted in her illness and eventual death.  He claims that the ear bruise was caused by a virus which probably invaded the brain, eventually causing her death.  The Defendant argues that he was a loving father figure to Brenda, and that he worked two jobs to support her and Boudreaux.  As the State argues, there is nothing in the record to support any of these contentions.  As was stated previously, the doctors testified that Brenda's Adams Oliver Syndrome had nothing to do with the injury that killed her.  No evidence was introduced to prove that any of the medical diagnoses

in this case were incorrect.  There was no evidence introduced to
show that the ear bruise was caused by a virus.

Based on our review of the law and the entire record, we find
that the evidence, viewed in the light most favorable to the
prosecution, was sufficient to convince a rational trier of fact that all
of the elements of the crime of second degree murder had been
proven beyond a reasonable doubt.  Jackson, 443 U.S. 307, 99 S.Ct.
2781, 61 L.Ed.2d 560; State v. Captville, 448 So.2d 676 (La.1984).
These assignments of error lack merit.[56]

In the instant case, the state court identified the proper standard, i.e. the Jackson

standard, and applied it in a reasonable manner.  Therefore, petitioner has failed to demonstrate that

the state court's decision was contrary to, or involved an unreasonable application of, clearly

established federal law, as determined by the Supreme Court of the United States.  Accordingly,

applying the AEDPA's deferential standard, this Court rejects petitioner's claim challenging the

sufficiency of the evidence.

Sentencing Issue

Petitioner claims that the trial court failed to recognize a mandatory sentencing issue.

That claim, which was first asserted in the state post-conviction proceedings, was rejected on

procedural grounds.  The state district court found:

In his Third assignment of error, defendant alleges that the
trial court failed to recognize the mandatory sentencing issue.
Defendant filed an appeal with the Fifth Circuit Court and raised
several Pro Se arguments; however, he failed to raise this issue ... on
appeal.  The defendant's claim is an appealable issue and he is, thus,
procedurally barred from raising this claim on post-conviction relief
since he had the opportunity to do so on appeal.  State v. Gaines, 97-
1327 (La. App. 4 Cir. 9/19/97), 701 So.2d 688.  Nevertheless, this

---

[56] State v. Richthofen, 803 So.2d at 183-87; State Rec., Vol. I of VIII.

> Court will grant defendant thirty (30) days from the date of this order
> to state written reasons for his failure to raise this issue on appeal.[57]

In response to that order, petitioner again contended that the claim was not asserted on appeal because his appellate counsel was ineffective.  The state district court again rejected that contention and thus denied petitioner's claim based on the aforementioned procedural ground.[58]  The Louisiana Fifth Circuit Court of Appeal found "no error" with respect to those rulings,[59] and the Louisiana Supreme Court denied a related writ application without assigning reasons.[60]

> As previously noted:

> A claim that a state has withheld a federal right from a person in its
> custody may not be reviewed by a federal court if the last state court
> to consider that claim expressly relied on a state ground for denial of
> relief that is both independent of the merits of the federal claim and
> an adequate basis for the court's decision.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).

For the reasons previously set forth in this opinion, the Court finds that the procedural rule invoked with respect to the instant claim, i.e. that a post-conviction claim is waived if not asserted on direct appeal, is an adequate and independent state procedural ground to support the

---

[57]  State Rec., Vol. II of VIII, Order dated April 27, 2004.

[58]  State Rec., Vol. II of VIII, Order dated June 14, 2004.  See footnote 28 and accompanying text.

[59]  Richthofen v. Cain, No. 04-KH-866 (La. App. 5th Cir. July 23, 2004) (unpublished); State Rec., Vol. II of VIII.

[60]  State ex rel. Richthofen v. State, 904 So.2d 687 (La. 2005) (No. 2004-KH-2409); State Rec., Vol. II of VIII.

application of a procedural bar.[61]  Accordingly, this Court may proceed directly to a determination as to whether petitioner has established "cause and prejudice" with respect to his default.

Again, the only "cause" identified by petitioner is his assertion that his counsel was ineffective in asserting the claim on appeal.  As noted, the state courts rejected that contention.[62]  For the following reasons, this Court likewise rejects the contention.

Petitioner argues that, during voir dire, the trial judge gave the jury the mistaken impression, which was never corrected, that he would have discretion in sentencing despite the fact that a conviction of second degree murder carries a mandatory penalty of life imprisonment without benefit of parole, probation, or suspension of sentence.  La.Rev.Stat.Ann. § 14:30.1(B).  As noted later in this opinion, it is true that Louisiana law requires that a trial judge inform the jury of a mandatory penalty *if the defendant so requests*.  State v. Jackson, 450 So.2d 621, 633 (La. 1984); see also State v. Ford, 867 So.2d 835, 843 (La. App. 4th Cir. 2004); State v. Johnson, 820 So.2d 1223, 1226 (La. App. 4th Cir. 2002).  Here, however, trial counsel did not request, and the trial judge did not refuse, such an instruction.  Therefore, the any claim regarding the failure to give such an instruction was waived and *could not* be raised on appeal.  See La.C.Cr.P. art. 801(C) ("A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure

---

[61]  See pages 40-41 of this opinion.

[62]  See pages 39-40 of this opinion.

the alleged error); <u>State v. Howard</u>, 751 So.2d 783, 801 (La. 1999).  Accordingly, appellate counsel cannot be found deficient in failing to raise the claim.[63]

Because petitioner has not established "cause and prejudice" for his default, his claim is barred in federal court unless he demonstrates that the application of the bar will result in a fundamental miscarriage of justice.  In that the Court has already determined that he has not and cannot make such a showing in this case,[64] his claim is barred from federal review.

Ineffective Assistance of Counsel

Petitioner claims that both his trial counsel and appellate counsel were ineffective.

With two exceptions, all of petitioner's claims regarding his appellate counsel were previously addressed in the sections of this opinion regarding the procedurally barred claims. Accordingly, those claims, having already been addressed in full and rejected by both the state courts and this Court, merit no further discussion.

The only claims regarding appellate counsel which have not yet been addressed are the claims that counsel was ineffective in failing to raise on appeal a contention that the prosecutor gave an improper rebuttal argument regarding Ms. Casbon's testimony and made an improper remark regarding petitioner's failure to present evidence.

As to the contention regarding the rebuttal argument, the claim is based on the following portion of the transcript:

---

[63]  Moreover, as noted on pages 87-89 of this opinion, trial counsel was not ineffective in failing to request such an instruction.

[64]  <u>See</u> pages 22-23 of this opinion.

-  66  -

MR. BATES:

....

Let's now consider the testimony of Jessica, well, not just her testimony but the picture that has been painted by her by a couple of witnesses who have been called to testify in this case. And I'm going to start with Ms. Casbon, and I apologize, but she was the only witness called by the Defense, the young lady who had formally [sic] dated the Defendant and who was given this information by Brittany relative to Jessica trying to frame the Defendant for this offense. I guess it's curious to me –

MS. NAQUIN:

Your Honor, may I object? Approach, please.

(Whereupon discussion is held outside the hearing of the jury panel)

MS. NAQUIN:

This is rebuttal. I did not go into Ms. Casbon's testimony at all. I didn't mention her by name.

MR. BATES:

Well, it doesn't matter that she didn't mention her name. She certainly mentioned the allegations relative to Jessica Avila. Those allegations were brought to her attention through Brittany and they were stated by Jessica, I mean, by Ms. Casbon, so the fact that she did elude [sic] to it didn't mean that she didn't go into the issue of Jessica Avila. Now I think since she has attacked Jessica Avila I think I should be permitted to present to her the information presented during the course of the trial that they have been asked to consider in assessing Brittany's testimony.

MS. NAQUIN:

I agree, Your Honor, that I attacked Jessica Avila, but I did so with Brittany's testimony and Brittany's video. I did not use anything mentioned by Cynthia Casbon at all, and for him to go into her testimony, is beyond the scope of what I argued.

MR. BATES:

Again, I'm certain it was the information that was obtained from Brittany and that this witness testified to certainly was

– 67 –

referenced.  I'm not limited in addressing it.  She brought up Jessica Avila's credibility.  I shouldn't be limited in my explanation to the jury as to why Jessica Avila should be believed, and if that would include the circumstances surrounding another witness's testimony, the fact that she chose not to use that witness shouldn't in any way hamper me.

THE COURT:

The objection is overruled.  The scope of the Defense's closing argument certainly included the questioning of Ms. Avila's credibility and the Court will allow the State to go into that subject.[65]

Under Louisiana law, "[t]he trial judge has wide discretion in controlling the scope of argument." State v. Prestridge, 399 So.2d 564, 580 (La. 1981).  Clearly, that wide discretion was not abused by the trial judge in this instance.  Further, even where a prosecutor's remarks exceed the proper scope of rebuttal argument, "an appellate court may reverse the conviction only if it is thoroughly convinced that the jury was influenced by the remarks, and that the remarks contributed to the verdict."  State v. Jackson, 568 So.2d 599, 602 (La. App. 4th Cir. 1990); see also State v. Winfrey, 703 So.2d 63, 74 (La. App. 5th Cir. 1997); State v. Phillips, 670 So.2d 588, 596 (La. App. 4th Cir. 1996).  The remarks in question here clearly fall far short of that high standard.  Accordingly, because the outcome of the petitioner's appeal in the instant case would not have differed even if counsel had asserted a claim regarding the prosecutor's remark, the ineffective assistance of counsel claim necessarily fails.

---

[65]  State Rec., Vol. VI of VIII, transcript of March 17, 2000, pp. 141-43.

As to the contention regarding the prosecutor's remark concerning petitioner's failure to present evidence, that remark, as explained later in this opinion, was not improper.[66]  Accordingly, counsel was not ineffective in failing to challenge the remark on appeal.

For the following reasons, the Court likewise rejects petitioner's claims that his trial counsel was ineffective.

Having previously set forth the standards to be used in analyzing effective assistance of counsel claims,[67] the Court need not repeat those standards here.  The only difference which must be noted concerns the prejudice requirement.  In order to prove prejudice with respect to *trial* counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 694 (5th Cir. 1992).  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."   Crockett v. McCotter, 796 F.2d 787, 793 (5th Cir. 1986).

In the post-conviction proceedings, the state district court rejected petitioner's claims that his trial counsel was ineffective, holding:

> The Supreme Court of the United States established the standards for the claim of ineffective assistance of counsel in

---

[66]  See pages 80-81 of this opinion.

[67]  See pages 42-43 of this opinion.

Strickland v. Washington, 466 U.S. 668 (1984).  The test established by the Supreme Court provides that in order for a claim of ineffective assistance of counsel to prevail, the petitioner must show the counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment and that the deficient performance prejudiced the defense in that the errors were so serious as to deprive petitioner of a fair trial.

The Louisiana Supreme Court addressed this very issue in State v. Strahan, 325 So.2d 231 (La. 1975).

> "Further, failure of trial counsel to adequately question alibi witnesses, properly investigate the case, make an opening statement, have defendant take the stand, request particular special charges, and object to certain questions asked of witnesses at trial are all claimed to clearly show that defendant was not adequately and effectively represented at the trial.  We do not agree.  These charges are either leveled at decisions made by counsel during the heat of trial, the correctness of which cannot be determined by hindsight, or the validity of which is not evident from the record."  Id. at 233.

In the instant case, none of the defendant's claims seem to go beyond strategic choices made by his counsel at the time of the defendant's trial.  The defendant's claims are essentially with his counsel's decisions regarding testimony, witnesses and objections raised at trial.  These are considered trial tactics for the purposes of evaluating the performance of defendant's counsel.  Thus, defendant's claim must fail because his counsel's actions at trial was considered trial tactics and under the Strickland test, the defendant has failed to meet the two-prong-test.[68]

---

[68]  State Rec., Vol. II of VIII, Order dated June 14, 2004.

The Louisiana Fifth Circuit Court of Appeal found "no error" with respect to that ruling,[69] and the Louisiana Supreme Court denied a related writ application without assigning reasons.[70]   As previously noted, this Court must defer to the state court decision on an ineffective assistance of counsel claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1) Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).

Petitioner claims that trial counsel was ineffective in several respects.  This Court will address each of petitioner's contentions.

Petitioner claims that his counsel was ineffective in not allowing him to testify at trial. "[I]t cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." Rock v. Arkansas, 483 U.S. 44, 49 (1987).  However, petitioner has offered no proof whatsoever that counsel in fact prevented him from testifying.

Petitioner does not allege and the record does not suggest that petitioner ever made known to the trial court that his counsel was refusing to allow him to testify despite his stated desire to do so.  Of course, the mere fact that petitioner failed to stand up in open court and insist on testifying should not be dispositive of the issue.  See United States v. Mullins, 315 F.3d 449, 455 (5th Cir. 2002); see also United States v. Araujo, 77 Fed. App'x 276 (5th Cir. 2003).  Nevertheless, the

---

[69]   Richthofen v. Cain, No. 04-KH-866 (La. App. 5th Cir. July 23, 2004) (unpublished); State Rec., Vol. II of VIII.

[70]   State ex rel. Richthofen v. State, 904 So.2d 687 (La. 2005) (No. 2004-KH-2409); State Rec., Vol. II of VIII.

Court cannot ignore the fact that petitioner has never presented any evidence whatsoever either to the state courts or to this Court to corroborate his allegations. Without more, petitioner's bare allegations are insufficient to trigger either the granting of relief or further fact-finding by this Court. As the United States Seventh Circuit Court of Appeals noted in a case in which a petitioner alleged that he had been denied the right to testify by his counsel:

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." ...
>
> ... [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary – and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify – to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991); see also Turcios v. Dretke, No. Civ. A. H-97-0515, 2005 WL 3263918 (S.D. Tex. Nov. 29, 2005). This Court finds that, in light of the complete lack of evidentiary support for petitioner's contention, petitioner has failed to meet his burden to establish that he is entitled to relief.

Petitioner claims that his counsel was ineffective in failing properly investigate the case so that she could recognize and object to false testimony offered by the prosecution. A petitioner asserting a claim for inadequate investigation bears the burden to provide *factual support*

for his allegations as to what further investigation would have revealed.  Moawad v. Johnson, 143 F.3d 942, 948 (5th Cir. 1998).  Because petitioner has provided no factual support for the contentions he makes with respect to this claim, and because he has failed to establish that the prosecution in fact elicited material false testimony,[71] the claim necessarily fails.

Petitioner claims that his counsel was ineffective in failing to subpoena expert witnesses to refute the testimony of the state's medical experts.  "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative."  Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002) (citing Sayre v. Anderson, 238 F.3d 631, 635-36 (5th Cir. 2001)).  The United States Fifth Circuit Court of Appeals has noted:

> [U]nsupported claims regarding [an] uncalled expert witness are speculative and disfavored by this Court as grounds for demonstrating ineffective assistance of counsel.  Furthermore, [a petitioner] must be able to show a reasonable probability that, but for counsel's failure to request an expert, the jury would have had a reasonable doubt concerning his guilt.

Id.  Further, to show the prejudice required to support an ineffective assistance claim premised on the failure to call a witness, a petitioner "'must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'"  Id. (quoting Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985)).  Petitioner furnished neither the state court nor this Court any evidence in support of his bald assertions that expert witnesses were available to rebut the prosecution's medical evidence.  Petitioner has not provided an affidavit from such experts or any

---

[71]  See page 77 of this opinion.

- 73 -

other corroboration that they would have testified in a manner consistent with petitioner's contentions or, for that matter, that they would have testified at trial at all.  Petitioner has, therefore, failed to establish either that counsel's performance was deficient or that prejudice resulted from the failure to call such expert witnesses.

Petitioner claims that his counsel was ineffective in failing to object to the use of a videotape used to impeach Brittany.  As previously noted, the prosecution called Brittany at trial, where she testified as follows on direct examination:

> Q.    At any time did you see your dad pick Brenda up?
>
> A.    No.  He never picked her up before in that moment.
>
> Q.    You never saw him pick her up at any time while Brenda –
>
> A.    Becky.
>
> Q.    – while Becky.  I'm sorry.  You got me straight. – while Becky was gone to the hospital to see her dad.
>
> A.    No, he never picked her up.
>
> Q.    Have you ever told anybody that you saw your dad pick her up while Becky was gone to the hospital?
>
> A.    No, no, no, no, no, no.
>
> Q.    Did you remember talking to your mom about little Brenda at any time?
>
> A.    Yeah.  That was a long time ago.  I'm not sure if I remember. No, I don't remember what I told her.
>
> Q.    Do you remember talking to a nice lady named Ms. Omily?
>
> A.    No.

> Q.   Well, if you don't remember talking to her, I guess you wouldn't remember what you said when you talked to her, right?
>
> A.   Right.
>
> Q.   At this time, Brittany –
>
> A.   Yeah.
>
> Q.   – I'm going to put a video tape in and I'm going to ask you about this video tape.[72]

The videotape, which showed Brittany being interviewed and giving answers inconsistent with her trial testimony, was then played.  At that point, Brittany admitted that she was the girl in the videotape; however, she testified that her statements on the videotape were untrue and were made only because she was told that she would be punished unless she implicated petitioner.

Petitioner contends that counsel should have objected to introduction of the videotape. However, any such objection would have had no merit.  The Louisiana Code of Evidence expressly provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him."  La. Code Evid. art. 607(A).  The Code further provides:

> Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.

---

[72]   State Rec., Vol. V of VIII, transcript of March 16, 2000, pp. 63-64.

Id. art. 697(D)(2).  Accordingly, it is clear that Louisiana law allowed introduction of the videotape for impeachment purposes.

This Court notes that petitioner contends the videotape was inadmissible under article 607 because the prosecutor's *true* motive in introducing the videotape was not to impeach Brittany but was instead to use the statements on the videotape as substantive evidence of petitioner's guilt. That contention is wholly unsupported.  There is simply no evidence that, at the time the videotape was introduced, the prosecution's proffered reason for the evidence, i.e. to impeach Brittany's testimony on a crucial issue, was a pretext.

In light of the foregoing, any objection to the admission of the prior inconsistent statement would have been futile and meritless.  "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

Petitioner claims that his counsel was ineffective in failing to object to hearsay evidence regarding Brittany's prior inconsistent statements made to other witnesses, specifically Jessica Avila and Becky Boudreaux.  Regarding the statements introduced through Avila's testimony, those statements were introduced to impeach Brittany's trial testimony.[73]  Accordingly,

---

[73] See, e.g., State Rec., Vol. V of VIII, transcript of March 16, 2000, pp. 86-88 and 129-33.

as with the videotaped statements, those statements were clearly admissible and any objection would have been meritless.  As to Becky Boudreaux, petitioner fails to identify to which portion of her testimony he is referring.  The Court has reviewed her testimony in its entirety and has found no hearsay statements regarding Brittany.  According, the claim with respect to Becky Boudreaux's testimony necessarily fails.

Petitioner claims that his counsel was ineffective in failing to object to the prosecutor's knowing use of false testimony.  However, petitioner has failed to demonstrate that the testimony to which he points was even false, much less that the prosecutor knew it was false.  Much of the testimony referenced by petitioner is taken out of context, is allegedly contradicted by evidence not in the record, pertains to largely irrelevant matters, or is otherwise explainable.  The only example he gives which would be of any importance is the inconsistency between Becky Boudreaux's trial testimony that, when she arrived home on the date of the incident, Brenda was asleep, whereas in a prior statements to the police she allegedly indicated that Brenda was okay and playing at that time.  However, defense counsel questioned the witness about that inconsistency at length on cross-examination, and the witness clearly stated that it was her *prior statements* to the police which were untrue.[74]  Because petitioner has failed to establish that the prosecutor knowingly used false testimony, his related ineffective assistance of counsel claim must be rejected.

Petitioner claims that his counsel was ineffective in failing to object to and move for a mistrial based on the prosecution's use of petitioner's prior battery conviction.  After extensive

---

[74]  State Rec., Vol. IV of VIII, transcript of March 15, 2000, pp. 116-19.

pretrial hearings were held regarding the admissibility of that evidence, the trial judge ultimately ruled that evidence of the prior conviction was more probative than prejudicial and could be introduced at trial.[75]   Petitioner indicates that, prior to trial, defense counsel unsuccessfully challenged that ruling in the appellate courts.[76]  Based on those rulings, the prosecution and defense counsel entered into a stipulation at trial that petitioner pled guilty to the crime of simple battery pursuant to North Carolina v. Alford, 400 U.S. 25 (1971).[77]  In that pretrial rulings had already established the admissibility of the "other crimes" evidence, it would have been futile for defense counsel to object again at trial.   "[C]ounsel is not required to make futile motions or objections." Koch v. Puckett, 907 F.2d 524, 527 (5th Cir. 1990).

---

[75]  State Rec., Vol. IV of VIII, transcript of August 31, 1999, pp. 24-26.

[76]  Rec. Doc. 4, supporting memorandum, p. 2; see also State v. Richthofen, 754 So.2d 926 (La. 2000).

[77]  State Rec., Vol. VI of VIII, transcript of March 16, 2000, at pp. 196-97; see also State Rec., Vol. VI of VIII, transcript of March 16, 2000, at pp. 175-86. In connection with the stipulation, the trial judge provided the following explanation to the jury:

> Ladies and gentlemen, it would be appropriate for the Court to tell you or explain to you what the plea under the provisions of North Carolina versus Alford means.  When a Defendant pleads guilty under the provisions of North Carolina versus Alford, the Defendant does not admit that he committed the crime, but enters a plea of guilty to a charge on the basis that the plea of guilty is in his best interest.

State Rec., Vol. VI of VIII, transcript of March 16, 2000, at pp. 197-98.  This Court further notes that when a stipulation is a concession of facts which the state could have easily established at trial and no advantage would have inured to petitioner had counsel refused to enter the stipulation, a petitioner does not show the necessary prejudice to support an ineffective assistance of counsel claim regarding the stipulation.  See Berry v. King, 765 F.2d 451, 454-55 (5th Cir. 1985).

Petitioner claims that his counsel was ineffective in failing to object to the use of "gruesome and prejudicial" photographs.  In petitioner's discussion of this claim, he does not indicate to which photographs he is referring or provide any explanation whatsoever as to why he contends the photographs were "gruesome and prejudicial."  Therefore, there is no basis for this Court to find that counsel's failure to object to the unidentified photographs constituted deficient performance or that petitioner suffered any prejudice from their introduction.

Petitioner claims that his counsel was ineffective in failing to request an admonition or a mistrial when the prosecutor made an allegedly improper comment.  Petitioner's claim is based on the following exchange which took place during the prosecutor's closing argument:

MR. BATES:
... I didn't hear anyone from the Sheriff's Office come in.  I didn't hear any investigators or anybody who had asked to interview Brittany –

MS. NAQUIN:
Objection, Your Honor.  May I approach?

THE COURT:
You may.

(Whereupon discussion is held outside the hearing of the jury panel)

MS. NAQUIN:
Your Honor, the State cannot make reference to the Defendant's failure to bring anyone in.  He can't make reference to that.

MR. BATES:
I cannot make reference to the fact that the Defendant did not take the stand, but I certainly under the law can make reference to persons who would have been available and in a position to come in

and give information who for whatever reason did not and ask the jury to consider that.

MS. NAQUIN:
  I have no obligation to call any witnesses and you cannot point out the fact that we didn't. You cannot make references to that.

MR. BATES:
  Right, but you do have compulsory process and the right to do that if you think there is anybody out there who can be called to come in and give testimony beneficial to your client.

THE COURT:
  I'm going to ask you to rephrase your close so as not to make reference to the failure of the Defendant to present a case or call witnesses.

MR. BATES:
  Thank you, Your Honor.

(Conclusion of discussion)[78]

While acknowledging that counsel successfully objected to the prosecutor's comment, petitioner contends that counsel was ineffective in failing to go one step further and asking for the judge to admonish the jury to disregard the comment or to declare a mistrial.

This Court finds that, despite the fact that the trial judge implicitly sustained defense counsel's objection, the prosecutor's comment was not in fact improper. It is true that a prosecutor generally may not comment on a criminal defendant's failure to testify. However, the United States Fifth Circuit Court of Appeals has noted:

  The Fifth Amendment prohibits a prosecutor from commenting on a defendant's failure to testify if the prosecutor's

---

[78] State Rec., Vol. VI of VIII, transcript of March 17, 2000, pp. 144-45.

- 80 -

> manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on defendant's silence. The prosecutor's intent is not manifest if there is some other, equally plausible explanation for the remark. As for whether a jury would naturally and necessarily construe the remark as a comment on the defendant's failure to testify, the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury necessarily would have done so. Additionally, challenged comments are evaluated in the context of the trial within which they are made.

Cotton v. Cockrell, 343 F.3d 746, 751 (5th Cir. 2003) (internal citations and quotation marks omitted). Moreover, it generally is permissible for a prosecutor to comment on the failure of the *defense*, as opposed to *defendant*, to counter or explain the evidence or to present exculpatory evidence. See, e.g., United States v. Grosz, 76 F.3d 1318, 1326 (5th Cir. 1996); United States v. Borchardt, 809 F.2d 1115, 1119 (5th Cir. 1987); United States v. Guzman, 781 F.2d 428, 432 (5th Cir. 1986); Moore v. Wyrick, 760 F.2d 884, 886 n.2 (8th Cir. 1985); United States v. Soulard, 730 F.2d 1292, 1306 (9th Cir. 1984); United States v. Sorzano, 602 F.2d 1201, 1202 (5th Cir. 1979); Rosales v. Cockrell, 220 F.Supp.2d 593, 622-23 (N.D. Tex. 2001), aff'd, 48 Fed. App'x 103 (5th Cir. 2002).

The comment on which the instant claim is based was neither a direct nor indirect reference on the failure of the defendant to testify at trial. Accordingly, the comment did not run afoul of the Fifth Amendment and was in fact entirely permissible. By having the trial judge implicitly sustain the objection, petitioner has already received more than he was legally entitled; he was not further entitled to an admonishment or to a mistrial. Therefore, counsel did not perform

deficiently in failing to request such actions and petitioner was not prejudiced by the failure to do so.

Petitioner claims that his counsel was ineffective in failing to object and move for a mistrial based on allegedly improper comments made by the prosecutor during his arguments to the jury.  Petitioner points to several comments made by the prosecutor.

First, petitioner notes that the prosecutor asked the jury, "Which version of Brittany's testimony do you want to accept?"[79]  Petitioner argues that, by that comment, the prosecutor was impermissibly inviting the jurors to consider Brittany's videotaped prior inconsistent statement as substantive proof of the statement's content, rather than for the limited reason it was introduced, i.e. to impeach her trial testimony.  The Court finds that the comment, which was simply a reiteration of his prior comments regarding Brittany's trial testimony,[80] was a permissible comment that  her trial testimony should be rejected because it was incredible and completely contrary to her earlier statements.  That comment was not improper, and, therefore, counsel was did perform deficiently in failing to lodge an objection.

Second, petitioner argues that counsel was deficient in failing to move for a mistrial when the prosecutor vouched for the state's case.  However, petitioner fails to indicate which comment made by the prosecutor was impermissible in that regard.  This Court has reviewed the

---

[79]  State Rec., Vol. VI of VIII, transcript of March 17, 2000, p. 129.

[80]  State Rec., Vol. VI of VIII, transcript of March 17, 2000, pp. 109-11.

prosecutor's arguments in their entirety and finds no comment which could reasonably be construed as improper vouching for the state's case or a statement of the prosecutor's personal opinion.[81]

Third, petitioner argues that counsel was ineffective in failing to move for a mistrial when the prosecutor gave an allegedly improper rebuttal argument regarding Ms. Casbon's testimony. However, when defense counsel objected to the prosecutor's comment regarding that testimony, the objection was overruled.[82] In light of that ruling, it would have been futile and nonsensical for defense counsel to then request the declaration of a mistrial based on that same comment.

Fourth, petitioner argues that counsel was ineffective in failing to move for a mistrial when the prosecutor briefly wept during closing arguments. However, as noted previously, the Louisiana Fifth Circuit Court of Appeal considered and rejected on direct appeal petitioner's claim that he was entitled to relief based on the prosecutor's inadvertent emotional display, and this Court found no error in that ruling.[83] Therefore, petitioner would not have been entitled to a mistrial on

---

[81] The Court notes that it is improper for a prosecutor to express an opinion as to the defendant's guilt where there is underlying an implication that the prosecutor's statements are based on additional personal knowledge about facts of the case that are in not in evidence. See, e.g., United States v. Munoz, 150 F.3d 401, 414 (5th Cir. 1998); State v. Duke, 358 So.2d 293, 294 (La. 1978); State v. Sercovich, 246 La. 503, 519, 165 So.2d 301, 307-08 (La. 1964). However, such comments are not improper if it is apparent to the jury that the views are based on the evidence presented at trial rather than on personal knowledge of facts outside the record. See, e.g., Nichols v. Scott, 69 F.3d 1255, 1282-83 (5th Cir. 1995); State v. Sawyer, 350 So.2d 611, 614 (La. 1977); State v. Palmer, 775 So.2d 1231, 1236 (La. App. 1st Cir. 2000).

[82] State Rec., Vol. VI of VIII, transcript of March 17, 2000, pp. 141-43. See pages 67-68 of this opinion.

[83] See pages 47-51 of this opinion.

this basis, and, accordingly, counsel cannot be found to have performed deficiently in failing to request one.

Fifth, petitioner claims that counsel was ineffective in failing to move for a mistrial based on the fact that the prosecutor inaccurately predicted in his opening arguments that certain testimony would be adduced at trial.  Louisiana law provides:  "The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge."  La.C.Cr.P. art. 765.  Petitioner has cited no jurisprudence which supports his contention that a criminal defendant is entitled to a mistrial when a witness' testimony fails to conform exactly to a prosecutor's prediction in his opening statement. Moreover, considering the inherent unpredictability of a witness' actions once he is on the stand, such a drastic remedy would be entirely unworkable.  Rather, any potential prejudice that might conceivably result from a prosecutor's failed predictions is mitigated by jury charges, such as the ones given in the instant case, which instruct the jurors that opening statements are not evidence to be considered in their determinations.[84]  Again, petitioner has not shown that he would have been

---

[84]  In this case, the jurors were instructed:

> Statements and arguments made by the attorneys are not evidence.
> In opening statements the attorneys are permitted to familiarize you with the facts they expect to prove. ...
> The opening statements and the closing arguments are not to be considered as evidence.

State Rec., Vol. III of VIII, Criminal Charges, p. 3.

entitled to a mistrial on this basis, and, accordingly, counsel cannot be found to have performed deficiently in failing to request one.

Petitioner claims that his counsel was ineffective in failing to object to the judge's jury instruction concerning the burden of proof. The record reflects that, regarding burden of proof, the trial judge instructed the jury as follows:

> The defendant is presumed to be innocent until each element of the crime necessary to constitute his guilt is proven beyond a reasonable doubt. The defendant is not required to prove that he is innocent. Thus, the defendant begins the trial with a clean slate.
>
> The burden is upon the State to prove the defendant's guilt beyond a reasonable doubt. In considering the evidence, you must give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence. If you are not convinced of the guilt of the defendant beyond a reasonable doubt, you must find him not guilty.
>
> While the State must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt based on reason and common sense and is present when, after you have carefully considered all the evidence, you cannot say you are firmly convinced of the truth of the charge.[85]

Further, with regard to the element of intent, which seems to be the element of particular concern to this petitioner, the jury was additionally instructed: "Whether criminal intent is present must be determined in light of ordinary experience. Intent is a question of fact which may be inferred from the circumstances."[86]

---

[85] State Rec., Vol. III of VIII, Criminal Charges, pp. 1-2.

[86] State Rec., Vol. III of VIII, Criminal Charges, p. 6.

Those instructions were proper and consistent with the applicable law, and they in no way shifted to the defense the burden of proof on the element of intent.  State v. Mitchell, 674 So.2d 250, 245-55 (La. 1996); State v. Copeland, 530 So.2d 526, 539 (La. 1988); State v. Hill, 742 So.2d 690, 698 (La. App. 5th Cir. 1999).  Therefore, any objection to the instructions would have been meritless.  As previously noted, "[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite."  Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

Petitioner claims that his counsel was ineffective in failing to request a limiting jury instruction regarding the consideration of "other crimes" evidence.  However, as noted previously, the trial did in fact give an accurate limiting instruction regarding such evidence.[87]  Accordingly, petitioner's claim that counsel was ineffective in failing to request such an instruction necessarily fails.

Similarly, petitioner also claims that his counsel was ineffective in failing to request a special jury instruction regarding circumstantial evidence.  In his federal application, petitioner states that "it is assumed" that the judge failed to give a jury instruction regarding circumstantial evidence and that counsel should therefore have requested such as instruction.[88]  However, again, the record disproves petitioner's underlying assumption.  Regarding circumstantial evidence, the trial judge instructed the jurors as follows:

---

[87]  See pages 55-56 of this opinion.

[88]  Rec. Doc. 4, supporting memorandum, pp. 38-39.

> Evidence is either direct or circumstantial.  Direct evidence is evidence which if believed, proves a fact.  Circumstantial or indirect evidence is evidence which if believed proves a fact, and from the fact you may logically and reasonably conclude that another fact exists.
>
> You cannot find a defendant guilty solely on circumstantial evidence unless the facts proved by the evidence exclude every reasonable hypothesis of innocence.[89]

In that the trial judge instructed the jury regarding circumstantial evidence, and did so correctly,[90] petitioner's claim that counsel was ineffective in failing to request such an instruction necessarily fails.

Petitioner likewise claims that his counsel was ineffective in failing to request a jury instruction informing jurors that a conviction of second degree murder carries a mandatory sentence of life imprisonment.  Petitioner is correct that second degree murder carries such a mandatory sentence.  La.Rev.Stat.Ann. § 14:30.1(B).  It is also true that, under Louisiana law, "[w]hen the penalty imposed by statute is a mandatory one, the trial judge must inform the jury of the penalty *on the request of the defendant* ...."  State v. Jackson, 450 So.2d 621, 633 (La. 1984); see also State v. Ford, 867 So.2d 835, 843 (La. App. 4th Cir. 2004); State v. Johnson, 820 So.2d 1223, 1226 (La. App. 4th Cir. 2002).  That said, however, it does not necessarily follow that counsel's failure to request

---

[89]  State Rec., Vol. III of VIII, Criminal Charges, pp. 2-3.

[90]  In fact, the instructions track Louisiana jurisprudential and statutory law.  "Evidence is either direct or circumstantial.  Direct evidence is evidence which, if believed, proves a fact.  Circumstantial or indirect evidence is evidence which, if believed, proves a fact and from that fact you may logically and reasonably conclude that another fact exists."  Independent Fire Insurance Co. v. Sunbeam Corp., 755 So.2d 226, 237 n.6 (La. 2000).  "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."  La.Rev.Stat.Ann. § 15:438.

such an instruction constituted ineffective assistance.  Even if the Court were to assume that counsel should have requested such an instruction and performed deficiently in failing to do so, petitioner's claim nevertheless fails unless he can show that prejudice resulted.  No such showing has been made in this case.  Rather petitioner simply opines:

> [The jurors] labored under the mistaken belief that the court would determine the appropriate sentence to be imposed upon petitioner. *Perhaps* they believed that the judge would take into consideration the lack of evidence in the case and impose leniency.  Armed with knowledge that the judge had no choice but to impose a sentence of life imprisonment at hard labor, with no hopes of probation, parole or suspension of sentence, the jurors *might* have reached a different verdict.  It is to be remembered that the state's case was purely circumstantial, had the jury been informed of the mandatory sentence issue, the jury *might* have found petitioner guilty of a lesser offense instead of second degree murder.  The jury *may* have reasoned that petitioner should not have spend the rest of his life for a crime he *might* not have committed.[91]

Petitioner has offered no evidence whatsoever in support of his rank speculation as to what the jurors *may* have believed would happen if they returned a verdict of guilty as charged.  Moreover, petitioner's speculation that, despite their verdict, they may not have believed he was truly guilty as charged and thought that the judge would recognize that fact and "correct" their erroneous verdict by imposing a light sentence flies in the face of the instructions they were given.  For example, the jurors were instructed:  "If you are not convinced of the guilt of the defendant beyond a reasonable doubt, *you must find him not guilty*."[92]  Further, as previously noted, they were also instructed: "You cannot find a defendant guilty solely on circumstantial evidence unless the facts

---

[91]  Rec. Doc. 4, supporting memorandum, pp. 34-35 (emphasis added).

[92]  State Rec., Vol. III of VIII, Criminal Charges, p. 1 (emphasis added).

proved by the evidence exclude every reasonable hypothesis of innocence."[93]   Lastly, they were expressly instructed that, if they believed he was guilty of only a lesser included offense, they may convict him of only that offense:

> In order to convict the defendant of the offense charged you must find beyond a reasonable doubt that the state proved every element of the offense charged.
> If you are not convinced that the defendant is guilty of the offense charged, you may find the defendant guilty of a lesser offense if you are convinced beyond a reasonable doubt that the defendant is guilty of a lesser offense.[94]

Contrary to petitioner's unsupported speculation, there is no reason to believe that the jurors disregarded their instructions to convict him of the charged offense only if they found that offense had been proved beyond a reasonable doubt.  Likewise, in that the jurors obviously found beyond a reasonable doubt that petitioner had in fact murdered the helpless, disabled child, there is absolutely no reason to believe that they would have been inclined to return a different verdict if they had only known that petitioner would be imprisoned for life for that heinous crime.  Accordingly, the Court finds that petitioner has fallen far short of establishing prejudice with respect to this claim by showing that there is a reasonable probability that the result of the proceeding would have been different if counsel had requested the proposed jury instruction.  Accordingly, petitioner's claim should be rejected.

For all of the foregoing reasons, the Court finds that petitioner's allegations that he received ineffective assistance of counsel, whether considered individually or collectively, have no merit.

---

[93]  State Rec., Vol. III of VIII, Criminal Charges, p. 3.

[94]  State Rec., Vol. III of VIII, Criminal Charges, p. 6.

Further, in rejecting petitioner's ineffective assistance of counsel claims, the state court identified the proper standard, i.e. the Strickland standard, and applied it in a reasonable manner. Therefore, petitioner has failed to demonstrate that the state court's decisions rejecting those claims were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects those claims.

**RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Randy Richthofen be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twenty-sixth day of February 26, 2007.

<br>

SALLY SHUSHAN
UNITED STATES MAGISTRATE JUDGE